**ALDENS, INC., Appellant in No. 74–1971,**

v.

**Israel PACKEL, Attorney General for the Commonwealth of Pennsylvania, Individually and in his official capacity, Appellant in No. 74–1972.**

**Nos. 74–1971, 74–1972.**

United States Court of Appeals, Third Circuit.

Argued June 11, 1975.

Decided Aug. 27, 1975.

Bernard G. Segal, Ralph S. Snyder, James D. Crawford, Philadelphia, Pa., for appellant; Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Raymond N. Friedlander, Chicago, Ill., of counsel.

Lawrence Silver, Deputy Atty. Gen., Chief, Civ. Litigation, Harrisburg, Pa., Edward J. Weintraub, Asst. Atty. Gen., Joel Weisberg, Deputy Atty. Gen., Director, Div. of Consumer Affairs, for appellee; Bureau of Consumer Protection, Dept. of Justice, Harrisburg, Pa., of counsel.

Before SEITZ, Chief Judge, and ALDISERT and GIBBONS, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

We herein consider cross-appeals from a final order of the district court granting the defendant's motion for summary judgment on plaintiff's complaint, and also granting plaintiff's motion for judgment on the pleadings on defendant's counterclaim. *Aldens, Inc. v. Packel*, 379 F.Supp. 521 (M.D.Pa.1974). The plaintiff Aldens, Inc. (Aldens) originally sought both injunctive and declaratory relief against the enforcement of the Pennsylvania Goods and Services Installment Sales Act, 69 P.S. §§ 1101–2303 (Supp. 1975). In an amended complaint Aldens abandoned its prayer for injunctive relief and the case proceeded before a single district judge. Thus, this appeal properly comes to this court. To the amended complaint the defendant Israel Packel, the Attorney General of Pennsylvania (the Attorney General), filed an answer, and a counterclaim seeking injunctive relief enforcing the Act against the plaintiff upon a declaration of its constitutionality. The district court held that the statute was constitutional but refused to grant injunctive relief on the theory that the Attorney General could not obtain that relief in the courts of the Commonwealth. Thus it dismissed the

counterclaim. While there were no disputed facts presented since a stipulation had been agreed to, the Attorney General did challenge the relevancy of certain of the submissions. Since the legal issues raised by Aldens' appeal and those raised by the Attorney General are unrelated we treat the appeals separately.

## I. ALDENS' APPEAL.

Aldens is an Illinois corporation operating a mail order business. By catalogs and flyers mailed from its headquarters in Chicago, it solicits orders in fifty states, including Pennsylvania. It has no tangible property in Pennsylvania. It employs no agents, salesmen, canvassers or solicitors in Pennsylvania. It has no Pennsylvania telephone listing and except for its mail order catalogs and flyers it does not advertise by use of any Pennsylvania media. It does not use any Pennsylvania credit verification sources to check on the credit of its Pennsylvania customers, although a Chicago credit reporting agency to which it resorts does inquire of credit bureaus in Pennsylvania for such information. All merchandise orders are filled from outside Pennsylvania and shipped F.O.B. from a point of origin in another state. The customers pay the shipping, handling and transportation costs. Aldens is neither required to collect nor to remit Pennsylvania use taxes nor to qualify nor to register to do business in Pennsylvania. It accepts or rejects all orders for merchandise in Chicago. Only the Chicago office grants credit, and all credit application forms and credit agreements are mailed by Pennsylvania residents seeking credit to Chicago. Aldens' credit agreement, which is used nationwide, provides for a monthly service charge of 1.75% on balances of $350.00 or less, which is an annual percentage rate of 21%, and for a monthly service charge of 1% (12% annually) on that portion of the balance which exceeds $350.00. Payments are received in Chicago and credited to customers' accounts there. Aldens' credit agreements provide for the retention of a purchase money security interest in merchandise sold on credit, but it does not file any security interest document, does not enforce any security interests, and has a security interest in merchandise unpaid for only to the extent provided by law. The Aldens agreement complies with the Federal Truth in Lending Act, 15 U.S.C. §§ 1601–65 and applicable truth in lending regulations of the Board of Governors of the Federal Reserve System (Regulation Z), 12 C.F.R. §§ 226.1–.1002. The agreement also complies with applicable Illinois law. It does not comply with Pennsylvania law.

Aldens' annual sales to Pennsylvania customers approximate $14,900,000, which represents about 7.6% of its annual sales. Approximately 73% of the $14,-900,000 represents credit sales to some 90,000 Pennsylvania credit customers whose average balance is about $169.00. Were Aldens to comply with the Pennsylvania Goods and Services Installment Sales Act it would incur additional annual costs and expenses and would sustain annual revenue losses attributable to such compliance as follows:

"a. Approximate additional cost of preparing catalogs, advertising materials, and credit agreements containing Pennsylvania credit terms; special computer processing and handling costs for Pennsylvania customers in setting up accounts and producing monthly billing statements $ 53,000

b. Approximate loss of finance and service charge revenue from Pennsylvania customers $750,000

Total $803,000"

(Jt.App. at 33a).

The $53,000 in additional cost would be incurred in part because the Pennsylvania Act not only regulates credit rates,

but also requires specific disclosures and the use of specific forms of contracts and billing statements. Were Aldens to comply similarly with the provisions of varying statutes of other states which regulate revolving charge agreements in manners different from the Federal Truth in Lending Act and Illinois law, it would incur comparable additional expenses and revenue losses.

Pennsylvania contends that its Goods and Services Installment Sales Act applies to Aldens' credit sales to Pennsylvania residents because 69 P.S. § 1103 provides:

> "For the purposes of this act a retail installment contract, contract, retail installment account, installment account, or revolving account is made in Pennsylvania and, therefore, subject to the provisions of this act if either the seller offers or agrees in Pennsylvania to sell to a resident buyer of Pennsylvania or if such resident Pennsylvania buyer accepts or makes the offer in Pennsylvania to buy, regardless of the situs of the contract as specified therein.

> Any solicitation or communication to sell, verbal or written, originating outside the Commonwealth of Pennsylvania but forwarded to and received in Pennsylvania by a resident buyer of Pennsylvania shall be construed as an offer or agreement to sell in Pennsylvania.

> Any solicitation or communication to buy, verbal or written, originating within the Commonwealth of Pennsylvania from a resident buyer of Pennsylvania, but forwarded to and re-ceived by a retail seller outside the Commonwealth of Pennsylvania shall be construed as an acceptance or offer to buy in Pennsylvania."

Aldens contends that Pennsylvania cannot, consistent with the federal constitution, apply its consumer credit law to the transactions in question, which, it says, are Illinois contracts performed entirely outside Pennsylvania and in interstate commerce. Aldens contends, in other words, that § 1103 is a Pennsylvania choice of law rule setting forth a choice of law which that state cannot constitutionally make.

There are well recognized constitutional limitations upon state choice of law rules. As a framework for analysis of Aldens' challenge to § 1103 a review of those limitations is appropriate.

### A. The Due Process Limitation.

The due process clause of the fourteenth amendment limits the power of a state to export its sovereign decisional authority, including its authority to make choices of law, to transactions with which it has an insufficient minimum interest. The contours of this limitation have been defined for the most part in cases involving attempts at extraterritorial service of process,[1] but it has been applied in contexts outside the extraterritorial service of process area as well.[2] The "long arm" cases are the more recent, and in these the Supreme Court made an interest analysis which focused upon the interest of the state which would or would not suffice to justify *any* exercise of its sovereignty in connection with the transaction in dis-

---

1. See, e. g., *McGee v. International Life Insur. Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950); *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Henry L. Doherty & Co. v. Goodman*, 294 U.S. 623, 55 S.Ct. 553, 79 L.Ed. 1097 (1935); *Hess v. Pawloski*, 274 U.S. 352, 47 S.Ct. 632, 71 L.Ed. 1091 (1927); *Pennoyer v. Neff*, 95 U.S. (5 Otto) 714, 24 L.Ed. 565 (1877).

2. See, e. g., *Hartford Accident & Indem. Co. v. Delta & Pine Land Co.*, 292 U.S. 143, 54 S.Ct. 634, 78 L.Ed. 1178 (1934); *New York Life Ins. Co. v. Dodge*, 246 U.S. 357, 38 S.Ct. 337, 62 L.Ed. 772 (1918); *Allgeyer v. Louisiana*, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832 (1897), all invalidating on due process grounds the application of forum law to contracts made elsewhere by forum residents. *But see Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 652, 70 S.Ct. 927, 94 L.Ed. 1154 (1950) (Douglas, J., concurring); *Hoopeston Co. v. Cullen*, 318 U.S. 313, 63 S.Ct. 602, 87 L.Ed. 777 (1943).

pute.[3] Since *McGee v. International Life Insurance Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), it has been clear that the due process clause defines a rather low threshold of state interest sufficient to justify exercise of the state's sovereign decisional authority with respect to a given transaction. Aldens urges that Pennsylvania's interest in the Illinois contracts with Pennsylvania residents is insufficient to meet the due process threshold bar. We disagree. We think it clear beyond question that Pennsylvania has a substantial interest in the rates paid by its residents to foreign companies for the use of money and in the contracts setting those rates. The stipulated facts establish that Aldens would obtain $750,000 a year more in interest than a Pennsylvania seller could lawfully obtain on identical transactions if it did not comply with the Pennsylvania Act. Aldens suggests that the result of applying Pennsylvania law to its Illinois-centered activities may not be that Pennsylvania residents will pay less interest, but that those residents, in order to purchase the merchandise which Aldens sells, will have to borrow from small loan companies in order to buy for cash. (See Reply Brief for Appellant at 2 n. 2.) The small loan company rates are said to be substantially higher than the 12% and 21% rates charged by Aldens. See 7 P.S. § 6152. But this argument goes to the wisdom or social utility of Pennsylvania's choice of law, not to its constitutional power to make that choice. Aldens also conjures up extreme possible applications of the statute. It posits, for example, a case of a Philadelphia resident who mails an unsolicited order to a merchant in Atlantic City, New Jersey, for delivery to the Philadelphian's summer home in Ocean City, Maryland. Brief for Appellant at 35. The stipulation of facts does not establish that among Aldens' 90,000 Pennsylvania customers there is one fitting that case, and we express no opinion as to

whether in the case of the Atlantic City merchant the due process threshold would be met. It suffices to hold that Pennsylvania's interest in the rates which its residents pay for the use of money for purchase of goods delivered into Pennsylvania is substantial enough to satisfy any due process objection to its attempt at regulating the subject matter. To the extent that any of the cases referred to in footnote 2, *supra,* may suggest otherwise they must be deemed to have been limited by the more recent interest analysis approach of cases such as *McGee v. International Life Insurance Co., supra; Travelers Health Ass'n v. Virginia,* 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950), and *Hoopeston Co. v. Cullen,* 318 U.S. 313, 63 S.Ct. 602, 87 L.Ed. 777 (1943).

Aldens' chief reliance in its due process argument is on *National Bellas Hess, Inc. v. Department of Revenue,* 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967) which held that a provision of the Illinois use tax act which imposed a duty on an out-of-state mail order seller to collect Illinois use taxes was unconstitutional.[4] The Court treated the case as a tax case, and said:

"And in determining whether a state tax falls within the confines of the Due Process Clause, the Court has said that the 'simple but controlling question is whether the state has given anything for which it can ask return.' *Wisconsin v. J. C. Penney Co.,* 311 U.S. 435, 444 [61 S.Ct. 246, 85 L.Ed. 267]." 386 U.S. at 756, 87 S.Ct. at 1391.

Tax cases of necessity come in for special due process scrutiny. No state interest rates so high in the state scale of values as the state sovereign's fisc. At the same time no extraterritorial manifestation of sovereignty, except possibly arrest, is quite so offensive to common notions of its territorial limits. Thus, extraterritorial impositions of tax collection obligations have been upheld only

---

**3.** *But see Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

**4.** Aldens relies on *National Bellas Hess* in support of its commerce clause argument as well. See text at p. 49, *infra.*

when it can be said that a benefit has been conferred on the tax collector by virtue of the state's sovereignty, and the tax is related to that benefit. Since the Court found no way in which Illinois as a sovereign either conferred any benefit on the mail order seller or facilitated the transaction, it declined to permit extraterritorial imposition of a collection duty. The instant case presents an entirely different issue. Pennsylvania is not attempting to export any duty toward its treasury. Aldens is obtaining money from Pennsylvania residents in whom Pennsylvania has a local sovereign protective interest. There is simply no reason why in weighing the significance of that interest for due process purposes we should impose on Pennsylvania the higher burden it would have to meet in a tax collection case. Thus we reject Aldens' due process challenge to § 1103.

### B. The Full Faith and Credit Limitation.

The full faith and credit clause contains another limitation on the authority of one state to disregard the public acts of a sister state. Its limitation applies, even to a state with a sufficient interest in the transaction to satisfy the due process threshold, when, upon an analysis of competing factors, a sister state has a greater interest in regulating the transaction.[5] To a certain extent the considerations relevant under the due process clause and under the full faith and credit clause overlap. This is because those considerations on which Pennsylvania relies to overcome the due process limitation are placed on the scale when balancing its interest in applying its public policy against Illinois' interest. We must, therefore, first identify the competing interests and then attribute to them appropriate values. Since we have said already that Pennsylvania has a substantial interest in the rate paid by its residents for the use of money, we will turn to the competing interest of Illinois in the transaction.

Illinois affords to persons or corporations doing business there a law of contracts which sanctions the enforcement of contractual undertakings. But, granting that the contracts in issue here are substantially Illinois contracts, it does not follow that Illinois has an interest in every consequence that flows from them. Although in enacting § 1103 Pennsylvania speaks in terms of redefining the place of contracting, it does so only for the purpose of the Pennsylvania Goods and Services Installment Sales Act. Except to the extent that it requires compliance with that Act it gives full faith and credit to the Illinois law of contracts. If there is any conflict with an Illinois public act, it is only in connection with the regulation of the time-price differential charges by Illinois sellers to Pennsylvania buyers. Illinois also limits interest rates in consumer credit transactions, but it does so only by prohibiting exactions in excess of certain statutory maximums; the governing statute allows any rate to be taken in connection with an Illinois contract not in excess of the rate allowed by Illinois law.[6] Illinois has manifested no interest in requiring that firms headquartered there obtain the maximum interest allowed under its law. If Illinois actually specified the

5. *First National Bank v. United Air Lines, Inc.,* 342 U.S. 396, 72 S.Ct. 421, 96 L.Ed. 441 (1952); *Hughes v. Fetter,* 341 U.S. 609, 71 S.Ct. 980, 95 L.Ed. 1212 (1951); *Order of Commercial Travelers of America v. Wolfe,* 331 U.S. 586, 67 S.Ct. 1355, 91 L.Ed. 1687 (1947); *John Hancock Mutual Life Insurance Co. v. Yates,* 299 U.S. 178, 57 S.Ct. 129, 81 L.Ed. 106 (1936).

6. "When any written contract, wherever payable, shall be made in this state, or between citizens or corporations of this state, or a citizen or a corporation of this state and a citizen or corporation of any other state, territory or country (or shall be secured by mortgage or trust deed on lands in this state), such contract may bear any rate of interest allowed by law to be taken or contracted for by persons or corporations in this state, or allowed by law on any contract for money due or owing in this state; provided, however, that such rate of interest shall not exceed 8% per annum, except as expressly authorized by this Act or other laws of this State. . . ." 74 Ill. Rev.S. § 8 (Supp.1975).

terms on which Illinois sellers could contract, as in *Order of United Commercial Travelers v. Wolfe, supra,* we would be faced with a full faith and credit issue requiring a delicate balancing of competing interests. In this case, however, there is no conflict between Illinois policy and Pennsylvania policy and no public act of Illinois to which Pennsylvania has not but should give full faith and credit. Thus, the full faith and credit clause does not prevent application of Pennsylvania law.

## C. *The Commerce Clause Limitation.*

■ As we have seen the due process clause requires the identification of *any* Pennsylvania interest sufficient to justify the exercise of Pennsylvania sovereignty with respect to a given private transaction. The full faith and credit clause, on the other hand, requires a balancing of the possible competing interests of separate state sovereignties. Under the commerce clause our attention shifts to conflicts between local and national interests.

Classifying the Supreme Court's commerce clause adjudications for the purpose of analytical application may seem to many an exercise in futility. In this area of constitutional law, perhaps more than in any other, the political philosophy of the Court's majority at a given moment has influenced not only the outcome, but the reasoning of the decisions.[7] Thus an opinion from one era may reflect an evaluation of the relative weight to be given to local versus national interests that a later court has rendered obsolete. Complicating the picture further, the Court's majority has not always been consistent in its perception of the extent to which Congress rather than it should determine where the national interest lies. Nevertheless, some analytical framework must be attempted or we will be reduced to the even more futile exercise of color-matching the stipulated facts in this case to the commerce clause cases which appear to glow with the most nearly similar hue. We suggest, then, that the commerce clause limits the power of a state to impose its choice of law on any transaction that is within the broad ambit of congressional power to regulate interstate commerce, and

(1) is one in which Congress has made its own choice of law,[8] or

(2) is one in which Congress has made no specific choice of law, but

---

**7.** *See generally* F. Frankfurter, The Commerce Clause Under Marshall, Taney and Waite (1937).

**8.** As Chief Justice Marshall put it:

"If congress had passed any act which bore upon the case; any act in execution of the power to regulate commerce, the object of which was to control state legislation over those small navigable creeks into which the tide flows, and which abound throughout the lower country of the middle and southern states; we should feel not much difficulty in saying, that a state law coming to conflict with such act would be void. . . ."

*Willson v. Black-Bird Creek Marsh Co.,* 27 U.S. (2 Pet.) 245, 7 L.Ed. 412 (1829). Since 1829 the verbal formulation has changed from time to time. *See Cooley v. Board of Wardens of the Port of Philadelphia,* 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1852). Today, the word preemption is used sometimes without reference to the commerce clause source of the power to preempt. Note, the Preemption Doctrine: Shifting Perspectives on Federalism and the Burger Court, 75 Colum.L.Rev. 623 (1975). *Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed. 2d 547 (1973). *See e. g., Campbell v. Hussey,* 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947); *Kelly v. Washington ex rel. Foss Co.,* 302 U.S. 1, 58 S.Ct. 87, 82 L.Ed. 3 (1937); *cf. Pennsylvania v. Nelson,* 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640 (1956). The split decision in *Burbank v. Lockheed Air Terminal Inc., supra,* demonstrates that the Court's willingness to find a sufficiently express intention to exclude state choice of law in a given congressional enactment, is a close issue. But, Marshall's underlying constant is not disputed. When Congress has regulated commerce its word is law and its law is supreme.

(a) despite this inaction the nature of the subject matter requires a uniform national rule,[9] or

(b) the choice of law made by by the state discriminates against persons engaged in interstate commerce in favor of local interests,[10] or

(c) a non-discriminatory state choice of law, in an area where national uniformity may not be essential, imposes a burden on interstate commerce in excess of any value attaching to the state's interest in imposing its regulation.[11]

If the state choice of law does not run afoul of any of the foregoing categories it is valid under the commerce clause whether it is called a "police" regulation or a "tax" case, a regulation "of commerce," or if it goes by any other name. The label is not, or should not be, significant. What is, or should be, significant is the identification of factors which will place the case in one or another of the analytical categories, or in none.

In this case we can eliminate category (1), for although Congress has acted comprehensively in the field of retail installment credit in the Federal Truth in Lending Act, Act of May 29, 1968, Pub.L. No. 90–321, Title I, § 102 *et seq.,* 82 Stat. 146, 15 U.S.C. §§ 1601–65, it has not seen fit to regulate interest rates in that field. It has, moreover, expressly deferred to state authority. *See* 15 U.S.C. § 1610(b):

"This subchapter does not otherwise annul, alter, or affect in any manner the meaning, scope or applicability of the laws of any State, including, but not limited to, laws relating to the types, amounts or rates of charges, or any element or elements of charges, permissible under such laws in connection with the extension or use of credit, nor does this subchapter extend the applicability of those laws to any class of persons or transactions to which they would not otherwise apply."

This express congressional recognition of the appropriateness of a state law role with respect to interest rates in the field of consumer credit serves to eliminate category 2(a) as well. It might be argued that § 1610(b) may be construed as an express adoption of state law as the appropriate federal standard for measuring interest rates in consumer credit transactions.[12] But even if § 1610(b) is not so construed, at a minimum it is a congressional recognition that the maximum level of interest rates in consumer credit transactions is not a subject matter requiring a uniform national rule. In face of this express congressional rec-

---

**9.** In Justice Curtis' words:

"Whatever subjects of this power are in their nature national, or admit only of one uniform system, or plan of regulation, may justly be said to be of such a nature as to require exclusive legislation by Congress. . . ."

*Cooley v. Board of Wardens of the Port of Philadelphia,* 53 U.S. (12 How.) 299, 319, 13 L.Ed. 996 (1852). An application of Justice Curtis' formula to strike down a local law appears in *Southern Pacific Co. v. Arizona ex rel. Sullivan,* 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945). *Compare, Southern Pacific Co., supra,* with *Brotherhood Locomotive Firemen v. Chicago, Rock Isl. & Pac. R. R. Co.,* 393 U.S. 129, 89 S.Ct. 323, 21 L.Ed.2d 289 (1968) and *South Carolina State Highway Dep't v. Barnwell Bros., Inc.,* 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734 (1938) in which the Court found no requirement for national uniformity.

**10.** *See, e. g., Dean Milk Co. v. Madison,* 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951); *H.*

*P. Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949); *Baldwin v. G. A. F. Seelig, Inc.,* 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935); *Minnesota v. Barber,* 136 U.S. 313, 10 S.Ct. 862, 34 L.Ed. 455 (1890).

**11.** *See, e. g., Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) (tenuous state interest); *Bibb v. Navajo Freight Lines, Inc.,* 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959) (multiple burdens from conflicting state laws outweigh state interest).

**12.** *See e. g., Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *United States v. Gerlach Live Stock Co.,* 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950); *Prudential Ins. Co. v. Benjamin,* 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946); *Clark Distilling Co. v. Western Maryland Ry. Co.,* 242 U.S. 311, 37 S.Ct. 180, 61 L.Ed. 326 (1917).

ognition that national uniformity is not required it would not, we suppose, be open to the Court to hold otherwise.[13]

Aldens urges that the Pennsylvania statute falls within category 2(b) in that it discriminates against interstate commerce. The full flavor of the argument is best captured by a quotation:

"The Pennsylvania Act discriminates against interstate commerce in the sense that it benefits Pennsylvania companies making sales in Pennsylvania to non-Pennsylvania residents by leaving those in-state sales totally unregulated and burdens non-Pennsylvania companies making sales outside Pennsylvania to Pennsylvania residents by regulating the terms and conditions of those out-of-state sales. That is, the Pennsylvania Act applies to out-of-state companies doing business across Pennsylvania's borders, but not to Pennsylvania companies doing business across those same borders. Equally important, the Act discriminates in favor of Pennsylvania residents and against out-of-state residents when both make purchases from a Pennsylvania mail order house. The Pennsylvanian must be given notice of the terms of his contract in the form prescribed by the Act, will be subject only to the service charges permitted in the Act, and may sue for treble damages or ask the Commonwealth to prosecute the merchant who does not conform with the Act. On the other hand, a non-Pennsylvanian mailing an order identical to that of the Pennsylvania resident need be given no notice, may be charged any service charge the merchant sees fit to make and can neither recover damages or realistically hope that the merchant will be prosecuted for his actions." (Brief for Appellant at 27–28).

This argument is extremely fanciful. Pennsylvania makes no effort to regulate the time-price differential charged by anyone to a resident of another state. It explicitly negates any such effort by exempting transactions by Pennsylvania sellers with residents of other states.[14] Thus Pennsylvanians and Illini stand in exactly the same position in selling to Delawareans. It also places Pennsylvanians and Illini exactly on a par in selling to Pennsylvanians. No local interest is given an advantage within or without Pennsylvania. If Aldens wants to sell to a Pennsylvanian it can only do so on the same terms as a Pennsylvania mail order seller, who is engaged in interstate commerce. There is no discrimination.

Finally Aldens urges that the Pennsylvania act falls within category 2(c) by placing a direct burden on interstate commerce which cannot be justified by any interest of the Commonwealth. To put this argument in perspective we refer back to the discussion of the discrimination contention directly above. A mail order house located in Philadelphia, buying merchandise in interstate commerce, for resale in Pennsylvania, is in any realistic economic sense, engaged in interstate commerce just as much as is Aldens. Pennsylvania's regulation of the time-price differential in mail order sales by the Philadelphia mail order house, therefore, imposes on interstate commerce the same burden as in the case of sales by Aldens. Thus the decisive issue with respect to category 2(c) is not whether § 1103 is valid as applied to Aldens, but rather whether Pennsylvania can regulate the time-price differential on any consumer credit transaction in the stream of interstate commerce. The burden on interstate commerce does not depend upon the happenstance of respective locations of buyer and seller. The fundamental issue is whether the national interest in the free movement of money, credit, goods and services outweighs the valid local interest in restricting

---

13. The congressional intention to defer to state regulation of consumer credit rates is far more explicit in § 1610(b) of the Truth in Lending Act than was the congressional intent to exclude such regulation in *Burbank v. Lockheed*

*Air Terminal, Inc.,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973).

14. 69 P.S. § 1103 purports only to apply to residents of Pennsylvania.

maximum interest rates on consumer "loans" and setting uniform contract terms for such transactions. Before the emergence of a national currency and a national monetary policy, and especially before the emergence of national concern over consumer protection in interstate commerce, the issue would not have been seriously debated. But even in the period since these developments, no case that we have been referred to has even so much as hinted that usury laws and related contract laws are not appropriate matters for local regulation. This despite the facts that such laws do burden interstate commerce, and that the burden is increased by the lack of uniformity.[15] Considering, however, the historical recognition that the states may, despite the burden on commerce, enact varying usury laws and varying contract laws, any judgment that the

---

**15.** The extent of disparity in state treatment is described in Aldens' brief:

"Of the 47 jurisdictions which regulate finance charges on revolving credit accounts, 42 regulate only transactions entered into within the regulating state in terms of traditional contract law. The statutes in a number of states affirmatively restrict their application to in-state transactions: Alaska Stat., § 45.10.220(8); Calif.Civ.Code, § 1802–7; Colo.Rev.Stat., § 73–1–201; Conn.Rev. Stat. § 42–83(e), Laws of 1972, P.A. No. 40; Del.Code Ann., Tit. 6, § 4301; D.C.Code, § 28–3701(3); Ida.Code § 27[28]–31–201; Ind.Stat.Ann. § 24–4.5–1–201; Kan.Stat.Ann. § 16a–1–201; La.Rev.Stat., § 9:3511; Mo. Rev.Stat. § 408.250(12); Nev.Rev.Stat. § 97.-095; N.Y.Pers.Prop.Law, Ch. 41, Art. 10, § 401.8; Okla.Stat.Ann., Tit. 14A, § 1–201; P.R.Laws Ann., Tit. 10, § 7131.6 [731.6]; S.C. Consumer Protection Code, Laws of 1974, H.B. 2356, § 1.201; Utah Code Ann. § 70B–1–201; Wash.Rev.Code § 63.14–010(7). Many other jurisdictions have no specific provision concerning the application of their regulations, but make them applicable to in-state transactions by the normal common law principles: Code of Ala., Recompiled, Tit. 5, §§ 316–41; Ariz.Rev.Stat. §§ 44–601–06; Fla.Stat. §§ 520.30–42; Ga. Code Ann. §§ 96–901–13; Ill.Rev.Stat., Ch. 121½ §§ 501–33; Me.Rev.Stat.Ann., Tit. 9, §§ 3981–92; Md.Ann.Code, Art. 83, §§ 153A–I; Mich.Comp.Laws, §§ 445.851– ; Minn.Stat. §§ 334.16–18; Miss.Code, § 75–17–1; Mont.Rev.Codes, §§ 74–601–12; Nebr. Rev.Stat., §§ 45–204–08; 74–601–12; Nebr. Rev. Stat., N.J.Rev.Stat. §§ 17:16C–1–61; N.M.Stat.Ann., §§ 50–16–1–15; N.C.Gen. Stat., §§ 25A–1–45; N.D.Cent.Code, §§ 51–14–01–05; Ohio Rev.Code, §§ 1317.01–99; R.I.Gen.Laws §§ 6–27–1–8; S.D.Laws of 1974, S.B. 10, §§ 1–4; Tenn.Code, §§ 47–11–101–10; Tex.Rev.Civ.Stat., Arts. 6.01–.09; Vt.Stat.Ann., Tit. 9, §§ 2401–10; Va.Code §§ 6.1–361–63; W.Va.Code, §§ 46A–1–101–8–102. Colorado, Idaho, Indiana, Kansas, Oklahoma, South Carolina and Utah, although recognizing the legality of out-of-state credit agreements with finance charges in excess of those permitted under their own laws, deny enforcement in their courts of so much of the finance charges as exceed the locally permitted rates.

By contrast, three states have enacted statutes which apply not only to the traditional agreement made within the state, but—at least under certain circumstances—also to revolving credit charge sales made to buyers residing in the state even though under traditional legal concepts the contract would be held to have been made in another state: Iowa Code, § 1.201 [537.1201]; Wis. Stat., § 421.201; Wyo.Stat., § 40–1–201. Effective January 1, 1975 a fourth state will join this group. Me.Rev.Stat.Ann., Tit. 9A, § 1.201. These states seek to give their residents protection even in interstate transactions, but do not at the same time try to free in-state companies from following the state regulations when they deal with out-of-state buyers.

Only Massachusetts (Mass.Gen.Laws, Ch. 255D, § 1) may conceivably have sought the same ends as the Pennsylvania Act, although the Massachusetts statute is plainly different on its face from Pennsylvania's. Indeed, the Massachusetts statute, based as it is on the place where the buyer signs the credit agreement, has a totally unpredictable scope given today's mobile population.

Those states which do not regulate service charges but do regulate disclosure or other conditions of sale or both also seek to apply their statutes only to transactions consummated in the regulating state either by explicit statutory provision, Ore.Rev.Stat., § 83.010(7), or by the application of common law principles, Haw.Rev.Stat., §§ 476–1—476–38 (see 476–29); Kent.Rev.Stat. §§ 371.-210–.330; N.H.Rev.Stat.Ann., §§ 391–B:1–:8 [359–B:1 to 359–B:8].

Arkansas has made no choice concerning the territorial application of its regulations of retail installment sales since it, alone among the states, has not yet adopted any legislation concerning terms, conditions or disclosure."

(Brief for Appellant at 28–29 n.10.)

present proliferation of regulations of consumer credit transactions has burdened commerce unduly must be made by Congress. Here the legislative judgment made in § 1610(b) of the Truth in Lending Act once more becomes significant. Congress has deferred to the states on the matter of maximum interest rates in consumer credit transactions. Since it has done so we decline to hold that the burden imposed by Pennsylvania on Aldens' interstate commerce by virtue of § 1103 is so great that it outweighs the Commonwealth's interest in regulating the rates which its resident consumers may pay for the temporary use of money or the terms on which they may contract for such use.

Specific reference must be made at this point to two cases which Aldens contends are most nearly color matches of the stipulated facts; *National Bellas Hess, supra,* and *Allenberg Cotton Co. v. Pittman,* 419 U.S. 20, 95 S.Ct. 260, 42 L.Ed.2d 195 (1974). The first we have already discussed in connection with Aldens' due process contention. The Court in *National Bellas Hess* held that the Illinois attempt to impose the duty to collect Illinois use taxes on an out-of-state mail order house was invalid under the commerce clause for the same reason that it was invalid under the due process clause—the business or transaction on which the obligation was sought to be imposed was not facilitated by Illinois' sovereignty. The case *sub judice* is distinguishable under the commerce clause for the same reasons set forth above in the discussion of the due process clause.[16] Pennsylvania is not attempting to export obligations to its treasury, or to export its public policy on consumer credit interest rates. It merely seeks to afford

uniform protection to all Pennsylvania residents with respect to such rates.

*Allenberg Cotton, supra,* involved a provision of Mississippi law which prohibited a foreign corporation transacting business in that state without a certificate of authority from bringing suit in a Mississippi court. The suit in question was by a Tennessee cotton merchant to enforce a forward contract in which a Mississippi farmer had contracted with the merchant to deliver his season cotton crop. Once he obtained the forward contract the cotton merchant made resale contracts in interstate commerce, and those resale contracts were reflected in the prices on a national commodities exchange. The cotton merchant had no office or employees in Mississippi on a regular basis, and accepted the farmer's contract, solicited by an independent broker, who had no authority to bind him. Recognizing that the purpose of the Mississippi statute was to encourage local qualification by foreign corporations, the Court held that this state interest was an insufficient justification for the very substantial burden which denial of judicial enforcement of the forward contract placed upon interstate commerce in cotton. It therefore reversed the dismissal of the complaint by the Mississippi state courts.

Those state statutes closing the courts to foreign corporations which fail to qualify locally are paradigms of our category 2(c). The state has an interest in requiring local qualification, and if there are sufficient local contacts by the foreign corporation the state may enforce that interest by imposing the severe sanction of closing local courts.[17] But where, as in *Allenberg Cotton, supra,* local presence has virtually no intrastate

---

16. Tax cases are frequently classified separately in commerce clause commentary. In the scheme of classification which we have set forth we would probably place them in category 2(c) recognizing that a balance is being struck, either judicially, *see, e.g., Northwestern States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959), or legislatively, *see* 15 U.S.C. § 381, between the interests of the several states in

deriving revenue from activities in interstate commerce and the burdens imposed by pursuit of that interest. But since this is not a tax case we need not here decide whether the more conventional separate classification of such cases is appropriate.

17. *Eli Lilly & Co. v. Sav-On-Drugs, Inc.,* 366 U.S. 276, 81 S.Ct. 1316, 6 L.Ed.2d 288 (1961).

aspect, the burden on interstate commerce from the imposition of the sanction outweighs the state's interest. Striking that balance is always a matter of federal law. But it is federal law on which the Court has received no instruction from Congress, and in which the Court proceeds on a case-by-case basis. The most significant difference between cases involving state statutes closing the door to foreign corporations and this case is that here Congress has expressly deferred to the states on the matter of consumer credit interest rates. Congress having used the legislative scales, there is no need and there may be no room for the kind of judicial weighing which produced one result in *Eli Lilly & Co. v. Sav-On-Drugs, Inc.*, 366 U.S. 276, 81 S.Ct. 1316, 6 L.Ed.2d 288 (1961) and another in *Allenberg Cotton, supra.* Even if Congress had not done so, *Allenberg Cotton* is in any event distinguishable from this case because of the significant local impact of the time-price differential paid by Pennsylvania residents and the relatively slight burden on interstate commerce from Pennsylvania's regulation of that differential.

We conclude then, that the district court properly granted the Attorney General's motion dismissing Aldens' complaint, because § 1103 conflicts with no provision of the federal constitution.

## II. THE ATTORNEY GENERAL'S APPEAL.

The Attorney General was sued by Aldens because he had, by virtue of his official position, assumed the responsibility for the enforcement of the Goods and Services Installment Sales Act, and had threatened enforcement against Aldens. He filed a counterclaim seeking both a declaratory judgment that the Act was constitutional and an injunction ordering Aldens to comply. The district court granted Aldens' motion for judgment, holding (1) that the counterclaim was not one permitted by Rule 13, Fed.R. Civ.P., and (2) that even assuming the counterclaim was proper the application for declaratory relief, duplicating the relief requested in the complaint, was redundant or moot by virtue of the summary judgment on the complaint, and (3) that since the Attorney General could not obtain injunctive relief in the state court to enforce the Act he may not obtain such relief in the federal court. The Attorney General contends that in all three holdings the district court erred.

 The district court's reasoning with respect to Rule 13 was that the Attorney General was not an "opposing party" within the meaning of the rule, although he was a proper defendant under *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The cause of action for a declaratory judgment or for enforcement relief, the theory goes, is that of the Commonwealth, not that of the Attorney General. The Attorney General is being sued not in the capacity of owner of the cause of action, but in the private capacity of a potential constitutional tort feasor. It is true that the "private constitutional tort feasor" fiction of *Ex parte Young* and its progeny overcame the holding in *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). But it does not necessarily follow that the same fiction must carry over into the interpretation of Rule 13.[18] In the fictional *Ex parte Young* cause of action, though the individual defendant is deemed not to be the state for purposes of sovereign immunity, he is deemed to be engaging in state action for purposes of the fourteenth amendment. The question is which fiction should prevail in interpreting the term "opposing party" in Rule 13. Oddly enough, we have been referred to no case squarely deciding the issue whether an *Ex parte Young*-type defendant is an "opposing party" for purposes of Rule 13.

---

**18.** Nor do those cases dealing with counterclaims against fiduciaries present more than a remote analogy. They involve situations in which the defendant, having been sued by a plaintiff acting in a fiduciary capacity, asserts a counterclaim against the plaintiff in his individual capacity. *See, e.g., Pioche Mines Consol., Inc. v. Fidelity-Philadelphia Trust Co.*, 206 F.2d 336 (9th Cir.), *cert. denied*, 346 U.S. 899, 74 S.Ct. 225, 98 L.Ed. 400 (1953).

The closest ·discussion is a dictum in *Dunham v. Crosby,* 435 F.2d 1177 (1st Cir. 1970), *overruled on another ground, Roper v. Lucey,* 488 F.2d 748, 751 n.3. (1st Cir. 1973). In that case the plaintiff brought a § 1983 suit against school board members and the Superintendent as individuals for an allegedly wrongful dismissal. The defendants counterclaimed, pursuant to a Maine statute, for the return of salary paid to a teacher not holding a proper teaching certificate. The district court dismissed the § 1983 action as to the Superintendent for failure to exhaust administrative remedies, and the counterclaim as a matter of discretion under *United Mine Workers v. Gibbs,* 383 U.S. 715, 724–27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The First Circuit reversed the dismissal of the complaint against the Superintendent and remanded for reconsideration of the dismissal of the counterclaim. Its full discussion of the counterclaim is set forth in the margin.[19] The discussion contains no reference to Rule 13 but suggests that the school board members in their individual capacities may not counterclaim to recover a debt owed, if at all, to the school board as such.

There are both distinctions and similarities between *Dunham v. Crosby* and our case. A major distinction is that the counterclaim was for the recovery of money rather than for declaratory and injunctive relief. A major similarity is that Aldens could not have brought suit against the Commonwealth directly because of its sovereign immunity, and the plaintiff in *Dunham* could not assert a claim under § 1983 against the municipal entity as such. *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Neither the similarities nor the dissimilarities seem to us controlling on the Rule 13 issue. That issue should be resolved consistently with the fundamental policy underlying Rule 13; that is, the expeditious resolution of all controversies growing out of the same transaction or occurrence or between the same parties in a single suit. This policy seems to us to point toward reliance on the fourteenth amendment fiction rather than the sovereign immunity fiction of *Ex parte Young,* and to the treatment of the Attorney General or other *Ex parte Young* defendant as an opposing party for purposes of the rule. This seems entirely appropriate when the counterclaim is for declaratory and injunctive relief.[20] Thus, we would not approve dismissal of the counterclaim on the first ground relied upon by the district court.

■ The second ground, that the prayer for declaratory relief is redundant and became moot upon the disposition of the complaint; has more to recommend it, where it is clear that there is a complete

19. "Having reinstated appellant's complaint against the Superintendent, however, the dismissal of the counterclaim must be viewed from a slightly different perspective. Obviously the Superintendent alone cannot bring the counterclaim; if appellant is liable to anyone, it is to the school board, as a unit. Indeed, we have some doubt whether the counterclaim was proper in the first place since the members of the school board were sued as individuals, although in their representative capacities. On the other hand, we assume that the question to be resolved at trial on remand is closely related to the counterclaim. For example, if the court should find that appellant was improperly dismissed and that the Superintendent would have otherwise signed the crucial affidavit, that finding would probably determine the question whether appellant was teaching illegally. Thus, adjudicating these issues at one time would be consistent with the approach to judicial economy underlying the Federal Rules of Civil Procedure.

We, therefore, decline to reverse the district court's disposition of the counterclaim but remand the case for further consideration in light of our reinstatement of the complaint against the Superintendent. If the court so chooses, it may decide to permit the school board or the appropriate party to intervene and counterclaim under F.R.Civ.P. 24, or it may devise some other procedure designed to facilitate an efficient resolution of the disputes." 435 F.2d at 1181 (footnote omitted).

20. Even when a counterclaim is for money, the practical difficulties mentioned by the First Circuit hardly seem insurmountable. For example, a judgment might provide that payment is required only when the missing entity tenders an appropriate satisfaction.

identity of factual and legal issues between the complaint and the counterclaim. See 6 C. Wright & A. Miller, Federal Practice & Procedure § 1406 (1971). Thus had the Attorney General sought only declaratory relief on the identical issue tendered by Aldens, we could justify dismissal of the complaint on this ground. But even a favorable ruling on the declaratory judgment could not render moot the request for injunctive relief. Thus we must move on to the court's final ground.

While a counterclaim for declaratory relief with respect to the validity under the federal constitution of a state statute is a federal cause of action, a counterclaim for enforcement of the Pennsylvania statute is one arising under Pennsylvania law. Aldens urges that the enforcement mechanisms of the Pennsylvania Goods and Services Installment Sales Act provide adequate remedies at law, that the statute does not contemplate and the Pennsylvania courts would not grant injunctive relief, and that in any event the Attorney General would not be the proper plaintiff in an action for such relief. The Act provides for criminal penalties, 69 P.S. § 2201, for a private cause of action on the part of the buyer to recover any time-price differential or service charge when such violated the Act, 69 P.S. § 2202, and in some cases for treble damages, 69 P.S. § 2204. Nothing in the Act precludes injunctive relief. However, the Statutory Construction Act of 1972, 1 P.S. § 1504 (1975 Supp.), states:

"In all cases where a remedy is provided or a duty is enjoined or anything is directed to be done by any statute, the directions of the statute shall be strictly pursued . . . .."

Aldens contends that under the predecessor to § 1504 the Supreme Court of Pennsylvania concluded that the existence of specific statutory remedies precluded resort to injunctive relief. *West Homestead Borough School District v. Allegheny County Board of School Directors*, 440 Pa. 113, 269 A.2d 904 (1970); *Commonwealth v. Glen Alden Corp.*, 418 Pa. 57, 210 A.2d 256 (1965). Whether the Pennsylvania courts would apply the same rule with respect to the Goods and Services Installment Sales Act in view of the intended remedial purpose and the large number of potential small claimants is a question of no little difficulty. If the Pennsylvania courts would grant injunctive relief, we do not believe the federal decision with respect to this permissive counterclaim should turn on the fact that in the state court the Attorney General would have commenced suit in the name of the Commonwealth. See the discussion respecting Rule 13 above. But a permissive counterclaim requires an independent basis of federal jurisdiction.[21] Unlike the counterclaim for declaratory relief, as to which there may be federal question jurisdiction, the counterclaim for enforcement of the Act arises under state law. A state is not a citizen for purposes of diversity jurisdiction.[22] While the complaint alleges, and the answer admits, complete diversity between Aldens and the Attorney General for purposes of Aldens' claim, we think it more proper to disregard the Attorney General's citizenship for diversity purposes when he seeks to enforce a state law claim on behalf of the state, even though he is an opposing party.

This leaves only pendent jurisdiction. Adjudication of a pendent state law claim is not a matter of right, but of discretion.[23] Considering the uncertainty under state law of the availability of injunctive relief for the enforcement of the Act the preferable course would have been to dismiss the complaint for injunctive relief without deciding it. That course would have left the Attorney General free to press a claim

**21.** 6 C. Wright & A. Miller, Federal Practice & Procedure § 1422 (1971).

**22.** *See State Highway Comm'n v. Utah Constr. Co.*, 278 U.S. 194, 49 S.Ct. 104, 73 L.Ed. 262 (1929); *Fifty Associates v. Prudential Ins. Co. of America*, 446 F.2d 1187, 1191–92 (9th Cir.

1970) and cases cited therein; *O'Neill v. Commonwealth*, 459 F.2d 1 (3d Cir. 1972).

**23.** *UMW v. Gibbs*, 383 U.S. 715, 724–27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Nolan v. Meyer*, 520 F.2d 1276 (2d Cir. 1975).

for injunctive relief in a state court free of the *res judicata* effect of a federal court decision on a state law issue.

We conclude, then, that the Attorney General's counterclaim for declaratory relief, presenting the identical issues posited by the complaint, was redundant and became moot when his motion for summary judgment was granted, that his permissive counterclaim for injunctive relief did not become moot, but that the district court should have dismissed that request for relief without deciding the merits of the state law issues it presented.

### III. CONCLUSION.

The judgment in No. 74–1971 will be affirmed. The judgment in No. 74–1972 will be affirmed to the extent that it granted judgment on the pleadings dismissing the counterclaim for declaratory relief, but vacated and remanded to the district court for the entry of an order dismissing the counterclaim for injunctive relief without prejudice.