**Irwin v. Citibank (South Dakota), N.A.**

*Michael D. Donovan,* for plaintiffs.
*Gordon Gerber,* for defendants.

AVELLINO, *J.,* December 9, 1993—The plaintiffs in this putative class action have pleaded statutory and common law claims totaling approximately $100 million.[1] Basically, they contend that Pennsylvania's Goods and Services Installment Sales Act, 69 Pa.C.S. §§1101-2303,

---

1. The proposed class consists of all residents of Pennsylvania who are or have been holders of Visa or Mastercard credit cards issued by Citibank.

prohibits the annual fees, late payment fees, return check fees, and so on ("loan charges"), which Citibank (South Dakota), N.A. charges its Visa and Mastercard customers.[2] Citibank has filed a preliminary objection in the nature of a demurer and, hence, concedes the validity of these assertions. Explaining it is a national bank located in Sioux Falls, South Dakota, Citibank has offered convincing evidence that its loan charges are in fact authorized by a South Dakota statute.[3]

If the court has a choice between the South Dakota law authorizing and the Pennsylvania law prohibiting the loan charges, Pennsylvania doctrine suggests the latter will prevail.[4] Insisting the court is not empowered to choose, Citibank argues that the South Dakota statute has been transformed, so to speak, into a federal one via section 85 of the National Bank Act ("section 85").[5] As such, it *preempts* the Pennsylvania law with which

---

2. See *e.g.,* 69 Pa.C.S. §1103 ("contracts within act"), section 1104 ("application" [to credit cards]), section 1904 ("rates of service charge on accounts"), section 1906 ("scope of service charge"), section 2204 ("treble recovery"); see also, the Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S. §201-9.2 ("private actions").

3. See S. D. Codified Laws Ann. §51A-12-13 (1991) (enumerating various fees and charges, and stating such fees and charges "shall be deemed interest").

4. On Pennsylvania choice-of-law doctrine, see *e.g., Aldens, Inc. v. Packel,* 524 F.2d 38 (3d Cir. 1975), *cert. denied sub. nom. Aldens, Inc. v. Kane,* 425 U.S. 943 (1976) (Pennsylvania's interest in protecting resident consumers by limiting the cost of credit plainly outweighs the due process, commerce clause, and full faith and credit objections of an out-of-state lender). *Accord Aldens, Inc. v. Ryan,* 571 F.2d 1159 (10th Cir.), *cert. denied,* 439 U.S. 860 (1978) (implicating Oklahoma choice-of-law doctrine); *Aldens, Inc. v. LaFollette,* 552 F.2d 745 (7th Cir.), *cert. denied,* 434 U.S. 880 (1977) (implicating Wisconsin choice-of-law doctrine).

5. 12 U.S.C. §85.

it happens to collide. The plaintiffs strenuously disagree. They argue, in substance, that short of armed conflict, South Dakota may not prohibit Pennsylvania from protecting her own citizens from the questionable practices of out-of-state lenders. If section 85 states otherwise, it is at odds with the federal Constitution and, hence, void. I am constrained to agree.

Briefly, section 85 authorizes Citibank to charge *"interest at the rate allowed by the laws of the state [in which it] is located"* (emphasis added) ("home state rates").[6] In the 1978 case of *Marquette Nat'l Bank v. First of Omaha Serv. Corp.,*[7] the Supreme Court elaborated upon the quoted language, and proclaimed that it enables a national bank to export, so to speak, home state interest rates ("exportation principle"). *Marquette* has been widely discussed,[8] but basically all the reader needs to know can be captured in two breaths. *First,* the Supreme Court never considered the constitutional implications of the exportation principle. Instead, the court observed that Congress has broad power over

---

6. *Id.* Citibank, which is headquartered in New York, is "located" in South Dakota for section 85 purposes.

7. 439 U.S. 299 (1978).

8. See *e.g,* Robert A. Burgess & Monica A. Ciolfi, *Exportation or Exploitation? A State Regulator's View of Interstate Credit Card Transactions,* 42 Bus. Law. 929, 935-941 (1987); Ralph J. Rohner, *Marquette; Bad Law and Worse Policy,* 1 J. Retail Banking 76 (1979) (each critiquing *Marquette).* For critiques of preemption doctrine generally, see *e.g.,* S. Candice Hoke, *Preemption Pathologies and Civic Republican Values,* 71 B. U. L. Rev. 685 (1991); Paul Wolfson, *Preemption and Federalism: The Missing Link,* 16 Hastings Const. L.Q. 69 (1988); Donald P. Rothschild, *A Proposed "Tonic," with Florida Lime to Celebrate our New Federalism: How to Deal with the "Headache" of Preemption,* 38 U. MIA. L. Rev. 829 (1984) (each contending the Constitution requires greater sensitivity to state prerogatives).

national banks, and *assumed* such power justified Congress' enabling one state to establish interest rates for another.[9] The jurisprudential leap of faith is nowhere explained.[10] *Second,* the Supreme Court never said the exportation principle required debtor state courts to apply *all* of the law, contract or otherwise—including the lacunas—of a bank's home-state that *might* affect the ultimate yield that a bank hoped to realize from its credit card program ("yield law"). Instead, the court confined its comments to interest rates of a numeric nature.

Nevertheless, *Marquette* triggered a series of events, mostly political, which caused approximately 70 million cardholders to be deprived of the consumer protections that had been mandated by their own states.[11] To begin with, the announcement of the exportation principle animated a few sparsely populated states, like South Dakota, to

---

9. See *e.g.,* Rohner *supra* note 8 at 80 ("The court ought to have shown greater sensitivity to state prerogatives instead of hiding behind a bland recapitulation of legal history ... .").

10. Although other explanations have been ventured, see *e.g.,* Rohner, *supra* note 8, this omission may be related to the fact that *Marquette* involved a clash between two greedy banks. A national bank based in Minnesota sued another based in Nebraska, complaining that the latter was charging 18 percent interest whereas Minnesota prohibited the former from charging more than 12 percent interest. Query, in private commercial litigation designed to void state law on preemption grounds, does either side truly represent the interests of the United States or those of the state whose law is challenged? For an intriguing proposal, see Hoke, *supra* note 8 at 758-60 ("If policy leaders and attorneys entrusted with enforcing federal law perceive no state law threat to federal interests, and choose not to bring a preemption challenge, a separate and possibly contradictory claim by private commercial entities *should not be heard ...")* (emphasis added).

11. See *e.g.,* Burgess & Ciolfi, *supra* note 8 at 929 & n.l.

relax or eliminate existing restrictions on "interest" in order to favor the national banks within their borders, and/or to attract the credit card affiliates of those located elsewhere ("bank friendly states").[12] Needless to say, the lawmakers in bank-friendly states have never been politically *accountable* to their out-of-state victims.[13] Next, local lenders complained bitterly that the exportation principle gave national banks too much. Congress responded by conferring *Marquette*-style advantages upon all federally insured institutions.[14] Finally, *Marquette* spawned several lower court decisions which said or implied that home-state yield law always preempted debtor state yield law.[15]

With a subject like national banks, it is common ground that Pennsylvania *must* defer to the federal government whenever it promulgates substantive rules. The home-state rate provision is such a rule, and was enacted in 1864 in order to guarantee *intrastate* parity between

---

12. *Id.* at 935-936.

13. On accountability, see *e.g.*, Lawrence H. Tribe, American Constitutional Law, §5-17 (1988): ("Under any theory that finds legitimacy in the supposed consent of the governed within a framework of constitutional limitations, the cooperative exercise of accountable power presupposes the possibility of tracing every such exercise to a choice ... for which someone can be held both politically and legally responsible.").

14. See *e.g.*, Comment, *Extension of the Most Favored Lender Doctrine Under Federal Usury Law: A Contrary View*, 27 Vill. L. Rev. 1077, 1109-13 (1981-82).

15. See *e.g.*, *Greenwood Trust Co. v. Commonwealth of Massachusetts*, 971 F.2d 818 (1st Cir. 1992), *cert. denied*, 113 S.Ct. 974 (1993); *Tikkanen v. Citibank (South Dakota) N.A.*, 801 F. Supp. 270 (D. Minn. 1992); *Mazaika v. Bank One, Columbus, N.A.*, 25 Phila. 192 (1992); *Gilbert v. Greenwood Trust Co.*, 9201-1233, slip op. (C.P. Phila., March 11, 1993) *appeal pending.*

state and national banks ("parity feature").[16] Frankly, for more than a century no one knew that the parity feature contained an exportation principle.[17] In any event, Congress now knows, and has neither revoked nor cabined *Marquette*.[18] Consequently, the Supreme Court's interpretation is controlling, and section 85, therefore, bestows upon South Dakota the authority to determine a numeric rate of interest (and perhaps yield law) for Pennsylvania, and *per extensio,* for the nation.

So construed, section 85 is unconstitutional. In a nutshell, it delegates too much congressional power to the wrong agency. See *e.g., Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 208 (1824) ("[C]ongress cannot enable a state to legislate [for the nation]"); *In re Rahrer,* 140 U.S. 545, 560 (1891) ("Congress [cannot] transfer legislative powers to a state nor sanction a state law in violation of the Constitution."); *Knickerbocker Ice Co. v. Stuart,* 253 U.S. 149, 164 (1920) ("Congress cannot transfer its legislative power to the states—by nature this is nondelegable."); *Cf. Home Insurance Co. v. Dick,* 281 U.S. 397, 410 (1930) (A state is without power to affect "the rights of parties beyond its borders having no relation to anything done or to be done within them."). See also, *Brown-Forman Distillers Corp. v. New York Liquor Auth.,* 476 U.S. 573 (1986); *Edgar*

---

16. See *e.g.,* Burgess & Ciolfi, *supra* note 8 at 933 ("[Section 85] was designed to rescue the nascent national banks from discrimination or oppressive state rate laws.").

17. See *e.g.,* Rohner, *supra* note 8 at 77-79.

18. See *e.g.,* Ralph J. Rohner, *Problems of Federalism in the Regulation of Consumer Financial Services Offered by Commercial Banks: Part I,* 29 Cath. L. Rev. 1, 38 & n.164 (1979) ("It is not surprising that at least one bill has already been introduced to reverse the *Marquette* decision."). On the demise of the legislative proposals to reverse *Marquette,* see *e.g,* Comment, *supra* note 14 at 1108-09.

*v. MITE Corp.,* 457 U.S. 624 (1982); *Southern Pac. Co. v. Arizona,* 325 U.S. 761 (1945) (each invalidating state laws that purported to regulate commercial conduct on an extraterritorial basis).

That one state may speak for the nation, Professor Tribe might say, "[is] contrary to the structural assumptions and the tacit postulates of the Constitution as a whole."[19] Frankly, no one seriously contends otherwise. See *e.g.,* Ronald D. Rotunda, John E. Nowak, J. Nelson Young, *Treatise On Constitutional Law* §12.6 (1986) ("Congress cannot delegate to Illinois the power to legislate federal pollution standards for the whole country. Then Congress would be abdicating interstate commerce control to one state to legislate for the nation."). As the Supreme Court itself has explained:

"The essence of our federal system is that within the realm of authority left open to them under the Constitution, the states must be *equally free* to engage in any activity that their citizens choose for the common weal...." (emphasis added)[20]

True, Congress may, and probably should, limit the loan charges imposed by out-of-state banks and their credit card affiliates. Moreover, Congress may, and probably should delegate that responsibility to a federal agency.[21] Congress may not, however, "go to the ball

19. L. Tribe, *supra* note 13 at section 5-20 & n.7.

20. *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 545-46 (1985). *Cf. National League of Cities v. Usery,* 426 U.S. 833, 845 (1976) ("We have repeatedly recognized that there are attributes to sovereignty attaching to every state government which may not be impaired by Congress, not because Congress may lack an affirmative grant of legislative authority to reach the matter, but because the Constitution prohibits it from exercising the authority in that manner.").

21. But see Wolfson, *supra* note 8 at 101 ("[A]dministrative agency officials, not subject to electoral constraints ... are even less likely

game and authorize the page boys to legislate, [because] the delegation would be unconstitutional."[22] Although state lawmakers are hardly congressional pages, they are equally *incompetent* to legislate for the nation.[23] For such Kafkaesque nonsense, We The People will require a new Constitution.

## ORDER

And now, December 9, 1993, the defendant's preliminary objection relating to federal issues is denied for the reasons set forth in the accompanying memorandum. Pursuant to 42 Pa.CS. §702(b), I hereby certify that this order implicates "a controlling question of law as to which there is substantial ground for difference of opinion;" and that an immediate appeal therefrom is likely "to advance the ultimate termination of the matter."

---

to consider the consequences to the states than are members of Congress."); Comment, *Administrative Preemption In Consumer Banking Law,* 73 Va. L. Rev. 912 (1987) (critiquing administrative preemption). See also, Ralph J. Rohner, *Problems of Federalism in the Regulation of Consumer Financial Services Offered by Commercial Banks: Part II,* 29 Cath. L. Rev. 313 (1980) (lamenting the proliferation of agencies which regulate consumer financial services).

22. Kenneth Culp Davis, *Administrative Law Text,* §2.01 (3d Ed., 1972). *Accord, Carter v. Carter Coal Co.,* 298 U.S. 238, 310 (1936) (invalidating a delegation to coal producers and workers); *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495 (1935) (invalidating a delegation to persons in the industry to be regulated). *Cf., Zschernig v. Miller,* 389 U.S. 429, 443 (1968) (Stewart J. concurring) ("Probate courts of the several states" are incompetent to conduct America's foreign affairs.).

23. State officials are competent, of course, to exercise delegated federal powers within their own borders. See *e.g,* Harold J. Krent, *Fragmenting the Unitary Executive: Congressional Delegations of Administrative Authority Outside the Federal Government,* 85 NW. L. Rev. 62, 80-84 (1990) (furnishing examples of federal-state cooperation).