**ALDENS, INC., Plaintiff,**

**v.**

**Patrick C. RYAN, Administrator of Consumer Affairs for the State of Oklahoma, Defendant.**

No. CIV–75–0458–D.

United States District Court,
W. D. Oklahoma.

June 14, 1976.

Jap W. Blankenship, Oklahoma City, Okl., for plaintiff.

John N. Brewer and Larry C. Brawner, Dept. of Consumer Affairs, Oklahoma City, Okl., for defendant.

Irvin D. Parker, Administrator of South Carolina Dept. of Consumer Affairs, Columbia, S. C., Patricia O. Brehmer, Asst. Atty. Gen., and Kathleen G. Smith, Dept. of Consumer Affairs, Columbia, S. C., amicus curiae.

## MEMORANDUM OPINION

DAUGHERTY, Chief Judge.

Plaintiff, Aldens, Inc. (Aldens) brings this action for a Judgment declaring

two provisions of the Oklahoma Uniform Consumer Credit Code (UCCC), 14A Oklahoma Statutes, § 1–101 et seq., to be Constitutionally invalid. The two challenged provisions, 14A Oklahoma Statutes, § 1–201(5)(a) and § 1–201A deal with the extraterritorial application of the maximum interest rate permitted in consumer credit sales by the Oklahoma UCCC and the denial of an Oklahoma forum to persons charging interest rates in excess of those permitted by the Oklahoma UCCC. Plaintiff asserts these provisions to be unconstitutional as violative of the Commerce Clause, Article I, Section 8, and the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States.[1] This case has been submitted to the Court on a stipulation of fact, the Briefs of the Parties and the Amicus Curiae Brief of Irvin D. Parker, Administrator of the South Carolina Department of Consumer Affairs. A three-judge District Court need not be convened pursuant to 28 U.S.C. § 2281 as only declaratory relief is sought. *Seergy v. Kings County Republican County Committee*, 459 F.2d 308 (Second Cir. 1972); *Communist Party v. State Bd. of Elec., State of Ill.*, 518 F.2d 517 (Seventh Cir. 1975).

█ Aldens is a Chicago, Illinois "mail order" house which, by means of the mail and other instrumentalities of interstate commerce, solicits and fills retail merchandise orders from Oklahoma residents. Some of Aldens' sales to Oklahoma residents would constitute consumer credit sales within the meaning of the Oklahoma UCCC if that Code were held to be applicable to it. Patrick C. Ryan is the Administrator of Consumer Affairs for the State of Oklahoma, and is charged by Statute with the administration of the Oklahoma UCCC. Ryan has threatened to enforce the maximum interest provisions of the UCCC against Aldens by virtue of the two Code provisions to which Aldens objects herein.[2]

Ryan has counterclaimed against Aldens for damages and an injunction. Ryan seeks the recovery of damages allegedly sustained by Oklahoma residents as a result of Aldens' alleged collection of excessive finance charges, and an injunction restraining the collection by Aldens, in the future, of such allegedly excessive finance charges.

## ELEVENTH AMENDMENT

█ Before reaching the merits of this case, the Court must consider a threshold jurisdictional matter which has not been raised by the parties. The Eleventh Amendment to the United States Constitution provides that:

> "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by a Citizen of another State . . ."

A State's Eleventh Amendment immunity from suit in Federal Court extends to an action against a State official in which the State is the real party in interest. *Standing Rock Sioux Indian Tribe v. Dorgan*, 505 F.2d 1135 (Eighth Cir. 1974). A State is the real party in interest in an action against one of its officials if the official, while acting in the capacity in which he is sued, is nothing more than an arm of the State performing a governmental function. *DeLong Corporation v. Oregon State Highway Com'n*, 233 F.Supp. 7 (D.Or.1964), Aff'd 9 Cir., 343 F.2d 911. It is clear that the Defendant herein, who is sued in his official capacity, is, in his official capacity, an arm of the State of Oklahoma performing a governmental function. Therefore, this suit is against one of the United States by a citizen of another State and, as such, Oklahoma enjoys Eleventh Amendment immunity from suit in a Federal Court.

---

1. Plaintiff asserted other grounds for the unconstitutionality of these two sections in its Complaint; however, Plaintiff's argument has been directed only to the Commerce Clause and the Due Process Clause of the Fourteenth Amendment.

2. 28 U.S.C. § 2201 requires an "actual controversy" between parties before declaratory judgment will lie. This requirement is satisfied by the threatened enforcement of an unconstitutional statute. *Universal Film Exchanges, Inc. v. City of Chicago*, 288 F.Supp. 286 (N.D. Ill.1968).

However, notwithstanding the language of the Eleventh Amendment which would appear to create a complete jurisdictional bar, a State may waive its Eleventh Amendment immunity and consent to be sued in a Federal Court. *Gallagher v. Continental Insurance Company*, 502 F.2d 827 (Tenth Cir. 1974). In this action, Defendant has answered the Complaint without objection to jurisdiction, asserted a Counterclaim, entered into a stipulation of fact and submitted the case for decision on its stipulation. On the basis of these facts, the Court finds and concludes that Oklahoma has waived its Eleventh Amendment immunity for purposes of this action only. Compare *Gallagher v. Continental Insurance Company, supra.*[3]

A second basis for the Court's exercise of jurisdiction herein is through the application of the doctrine of *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). That doctrine is that a State official acting pursuant to an unconstitutional statute is stripped of his representative capacity because a State cannot authorize its officers to act in an unconstitutional manner. See also *Mobil Oil Corporation v. Kelley*, 493 F.2d 784 (Fifth Cir. 1974). Thus, it appears that if the challenged provisions of the Oklahoma UCCC are in fact unconstitutional, Ryan would not be acting as an arm of the State in the enforcement of its UCCC against Aldens and Oklahoma's Eleventh Amendment immunity would be inapplicable in this action.

## FACTS

The operative facts of this case, as derived from the parties' stipulation of fact, are as follows: Aldens is an Illinois corporation whose only physical assets are in Chicago, Illinois. Aldens sells merchandise to customers who reside in all 50 States. Approximately 1.03% of Aldens' total sales for the twelve months ending September 26, 1975 were to Oklahoma residents. These sales amounted to about $2,051,000.00. Approximately 19% of that sum was derived from cash sales, the balance having derived from credit sales. Most of Aldens' credit sales constitutes consumer credit transactions within the meaning of the Oklahoma UCCC.

Aldens mails catalogs to its regular Oklahoma customers four times a year. Supplemental "flyers" are mailed to these same persons six to eight times a year. Advertising is included in credit customers' monthly billing statements. There are 31,600 names on Aldens' Oklahoma catalog circulation list. In addition, Aldens will mail catalogs and flyers to some 220,000 Oklahoma residents in the year 1975. These additional mailings will be to names taken from rented mailing lists. There may be some duplication in names between Aldens' regular catalog list and the rented mailing lists. Aldens has no agent in Oklahoma, it has no physical presence in Oklahoma, and it maintains no telephone listing in Oklahoma. Aldens' only advertising in Oklahoma is by mail. Aldens is not required to collect and remit the Oklahoma Use Tax. Aldens is not required to qualify or register to do business in Oklahoma.

Applications for credit accounts and credit agreement forms are included with the advertisements Aldens mail to Oklahoma residents. An Oklahoma resident who wishes to make a credit purchase from Aldens completes the credit application and agreement and returns them to Aldens along with his order. Aldens' standard credit agreement provides that it is an Illinois contract to be governed by Illinois law. Aldens grants credit only in Chicago. Aldens accepts orders only in Chicago. Twenty-two percent of all credit applications received from Oklahoma residents are checked against a national credit index. Twenty-three percent of such applications

---

**3.** This case is to be distinguished from *Richins v. Industrial Construction, Inc.*, 502 F.2d 1051 (Tenth Cir. 1974) wherein the Court found that Utah had not waived its Eleventh Amendment immunity by a statutory waiver of immunity which provided that actions brought pursuant thereto would be maintained only in Utah courts. Jurisdiction herein is not based on a statutory waiver of immunity, rather it is based upon a general appearance and conduct inconsistent with the assertion of Eleventh Amendment immunity.

are checked through a Chicago credit agency which obtains its information from Oklahoma credit bureaus. Aldens makes some direct calls to Oklahoma in checking Oklahoma credit applications.

Aldens' standard credit agreement provides for a monthly credit charge of 1.75% on balances of $350.00 or less. This amounts to a finance charge of 21% per year which exceeds the maximum finance charge permitted by the Oklahoma UCCC. On balances in excess of $350.00, Aldens' standard credit agreement provides for a monthly finance charge of 1% for that portion of the balance which is in excess of $350.00. This is less than the maximum finance charge permitted by the Oklahoma UCCC. Aldens' standard credit agreement complies with Regulation Z as promulgated by the Federal Reserve Board pursuant to the Federal Truth in Lending Act.

Merchandise sold to Oklahoma residents by Aldens is delivered through the mails or by common carrier. The means of delivery is selected by Aldens and the customer plays no part in this decision. Except for ten items which are sent free, the customer pays all shipping and handling costs. There are approximately 40,000 items in Aldens' catalog. Items are sent "F.O.B. Origin".

When an Oklahoma credit account becomes delinquent, Aldens attempts to collect by mail. Telephonic communication is used where appropriate. After an account has been delinquent for six months, Aldens turns it over to an independent collection agency. Aldens currently uses no Oklahoma credit agencies, although it has used Oklahoma credit agencies in the past. Neither Aldens nor any of its assignees has brought an action on account in Oklahoma since January, 1972.

Were Aldens to comply with the Oklahoma UCCC, it would suffer losses both from loss of finance charges and from special advertising and processing costs. These losses would amount to approximately $160,500.00 per year.

Aldens' Constitutional objections are directed to 14A Oklahoma Statutes § 1–201A which reads:

"With respect to a consumer credit sale or consumer loan to which this Code does not otherwise apply by reason of Section 1–201, if, pursuant to a solicitation relating to a consumer credit sale or loan received in this state, a person who is a resident of this state sends a signed writing evidencing the obligation or offer of the person to a creditor in another state, and the person receives the goods or services purchased or the cash proceeds of the loan in this state:

"1. The creditor may not contract for or receive charges exceeding those permitted by this Code, and such charges as do exceed those permitted are excess charges for purposes of Sections 5–202(3) and (4) and 6–113 of the Code and such sections shall apply as though the consumer credit sale or consumer loan were made in this state; and

"2. The provisions on Powers and Functions of Administrator (Part 1 of Article 6 of this Code)[1] shall apply as

"[1] Sections 6–101 to 6–116 of this title."

though the consumer credit sale or consumer loan were made in this state."

and 14A Oklahoma Statutes, § 1–201(5)(a) which reads:

"(5) If a consumer credit sale, consumer lease, or consumer loan, or modification thereof, is made in another state to a person who is a resident of this State when the sale, lease, loan, or modification is made, the following provisions apply as though the transaction occurred in this State:

"(a) a seller, lessor, lender, or assignee of his rights, may not collect charges through actions or other proceedings in excess of those permitted by the Article on Credit Sales (Article 2) or by the Article on Loans (Article 3); . . ."

### APPLICABILITY

Aldens' threshold contention is that 14A Oklahoma Statutes, § 1–201A is not applicable to it in its credit sales to Oklahoma residents because its goods are not "received" by its Oklahoma customers in Okla-

homa as is required by that section. Section 1–201A makes the Code applicable to an out-of-state seller, where (1) pursuant to solicitation relating to a consumer credit sale received in Oklahoma, (2) an Oklahoma resident sends a signed writing evidencing an obligation or offer to a creditor in another state, and (3) the Oklahoma resident receives the goods or services purchased in Oklahoma.

Aldens does not contend that elements (1) and (2) are not present herein. It does contend that because it sends its goods "F.O.B. Origin" and because risk of loss and title to such goods passes when the goods are placed into the hands of the carrier in Chicago, its goods are "received" by its Oklahoma customers when they are placed in the hands of the carrier in Chicago. Thus, it is Aldens' position that its goods are received by its Oklahoma customers in Chicago when the goods are placed in the hands of the carrier in Chicago.

 While Aldens may be correct in its contention that risk of loss and title to goods ordered by Oklahoma residents passes when such goods are placed into the hands of a carrier in Chicago, this does not mean that the goods are not "received" in Oklahoma within the meaning of § 1–201A. The fundamental principle of statutory construction is to give effect to the intention or purpose of the Legislature as expressed in the statute under scrutiny. *Trask v. Johnson,* 452 P.2d 575 (Okl.1969). In reading 14A Oklahoma Statutes § 1–201A, it becomes immediately clear that the intention of the Oklahoma Legislature in enacting this Section was to make provisions of its UCCC applicable to "mail order" type sales wherein a solicitation is received in Oklahoma and the goods sold pursuant to such a solicitation ultimately come to rest in the hands of purchasers in Oklahoma. To hold that goods are received only at the time and place where title and risk of loss pass would be to defeat the obvious intention of the Oklahoma Legislature. Thus, 14A Oklahoma Statutes, § 1–201A is applicable to any situation wherein, if the other conditions are met, goods are delivered to an Oklahoma resident in Oklahoma. Passage of title and risk of loss are not important to the application of this Section. 14A Oklahoma Statutes, § 1–201A is therefore applicable in its terms to Aldens' transactions with its Oklahoma customers.

## DUE PROCESS AND EXTRATERRITORIAL REGULATION

 The first of Aldens' Constitutional contentions which should be considered is its assertion that the Due Process Clause of the Fourteenth Amendment prohibits Oklahoma's regulation of the finance charge assessed by Aldens in its consumer credit sales to Oklahoma residents. Unquestionably, the Due Process Clause of the Fourteenth Amendment limits the power of a State to extend the effects of its laws beyond its borders. *Hartford A. & I. Co. v. Delta & Pine Land Co.,* 292 U.S. 143, 54 S.Ct. 634, 78 L.Ed. 1178 (1934). However, more States than one may seize hold of local activities which are part of multi-State transactions and regulate to protect its own people. *Watson v. Employers Liability Assur. Corp.,* 348 U.S. 66, 75 S.Ct. 166, 99 L.Ed. 74 (1954). Where a contract affects the people of several States, each may have an interest which leaves it free to enforce its own contract policies. *Watson v. Employers Liability Assur. Corp., supra; Alaska Packers Asso. v. Industrial Acci. Com.,* 294 U.S. 532, 55 S.Ct. 518, 79 L.Ed. 1044 (1935). In determining whether a State may extend the effects of its laws beyond its borders, the Supreme Court has examined the degree of contacts which the State seeking to regulate has with the person and/or transaction sought to be regulated. See *Watson v. Employers Liability Assur. Corp., supra,* and *Clay v. Sun Insurance Office,* 377 U.S. 179, 84 S.Ct. 1197, 12 L.Ed.2d 229 (1964).

In *Watson v. Employers Liability Assur. Corp., supra,* the Court overruled a Fourteenth Amendment due process challenge to a Louisiana Statute which permitted direct actions against insurers even though the insurance policy sued on might have a no action clause. The facts of the case were

that a British corporation issued a policy of liability insurance to an Illinois manufacturer. The policy, which was negotiated in Massachusetts and delivered both in Massachusetts and Illinois, contained a no action clause which was valid both in Massachusetts and Illinois. A Louisiana resident was allegedly injured through the use of the Illinois manufacturer's product and brought an action against the British insurer in a Louisiana State Court. The case was removed to a United States District Court where it was dismissed on the basis that the insurance policy sued on prohibited such direct actions, and that the Louisiana Statute permitting direct actions under which the Plaintiff proceeded controverted the Due Process Clause of the Fourteenth Amendment. The District Court was initially sustained on appeal but reversed by the Supreme Court. The Supreme Court held that Louisiana had sufficient contacts with the British insurer to allow the application of the Louisiana direct action statute in the case. The factors that were considered by the Supreme Court in reaching its decision were that persons injured in Louisiana were likely to be Louisiana residents, injured persons were likely to be treated in Louisiana hospitals, injured persons were likely to become wards of the State if they did not achieve recovery for their injuries, and actions against the manufacturer on the basis of any such injuries were likely to be brought in Louisiana State Courts.

In this case the contacts between Aldens and Oklahoma are much more direct and substantial than were the contacts between Louisiana and the British insurer in *Watson, supra.* Aldens solicits orders from Oklahoma residents. Goods are shipped by Aldens from Chicago to its Oklahoma customers in Oklahoma, and credit payments are sent from Oklahoma to Chicago by Aldens' Oklahoma credit customers. Thus, there are direct and continuing contacts between Oklahoma and Aldens with respect to the transaction Oklahoma seeks to regulate. The collection of excessive interest rates from Oklahoma residents would have a direct effect on the State of Oklahoma.

Thus, there are sufficient contacts between Oklahoma and Aldens to overcome Aldens' due process objections to the application of 14A Oklahoma Statutes, § 1–201A to it with respect to its credit sales to Oklahoma residents.

## COMMERCE CLAUSE

Aldens advances a two-prong attack on 14A Oklahoma Statutes, § 1–201A under the Commerce Clause. Aldens contends (1) Oklahoma may not regulate its interest charges because its mail order sales to Oklahoma residents are transactions purely in interstate commerce, and (2) Oklahoma's regulation of its interest rates constitutes a multiple burden on interstate commerce.

The Commerce Clause, in conferring on Congress the power to regulate commerce, did not wholly withdraw from the State the power to regulate matters of local concern with respect to which Congress has not exercised its power, even though such State regulation might affect interstate commerce. *California v. Thompson,* 313 U.S. 109, 61 S.Ct. 930, 85 L.Ed. 1219 (1941). Ever since *Wilson v. Black Bird Creek Marsh Co.,* 2 Pet. 245, 7 L.Ed. 412 (1829) and *Cooley v. Port Wardens,* 12 How. 299, 13 L.Ed. 996 (1851), it has been recognized that there are matters of local concern, the regulation of which unavoidably involves some regulation of interstate commerce, but which, because of their local character, their number and their diversity, may never be fully dealt with by Congress. In the absence of Congressional action, the regulation of such matters has, subject to other applicable Constitutional restraints, been left to the States. *South Carolina State H. Dept. v. Barnwell Bros.,* 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734 (1938). However, ever since *Gibbons v. Ogden,* 9 Wheat. 1, 6 L.Ed. 23 (1824), the States have not been deemed to have authority to impede the free flow of commerce from State to State, or to regulate those phases of the national commerce which, because of the need for national uniformity, demand that their regulation, if any, be prescribed by a

474

single authority. *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945).

The test for determining the validity under the Commerce Clause of a State Statute affecting interstate commerce in an area in which Congress has not acted and which does not require a uniform national policy has been stated as follows:

"Where the Statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

■■■ Thus, there are four factors which should be considered in determining whether a State Statute which affects interstate commerce is valid under the Commerce Clause: (1) Has Congressional action preempted the field; (2) does the State regulation affect an area which requires a uniform national policy; (3) does the State regulation evenhandedly effectuate a legitimate local public interest; (4) is the burden imposed upon interstate commerce clearly excessive in relation to the putative local benefit. See also *Aldens, Inc. v. Packel*, 524 F.2d 38 (Third Cir. 1975), cert. den. 425 U.S. 943, 96 S.Ct. 1684, 48 L.Ed.2d 187.

■■■ With regard to the first of the above stated factors, Congress has clearly not pre-empted the field of regulation of maximum interest rates allowable in consumer credit transactions. Congress has acted comprehensively in the field of consumer credit through the Federal Truth In Lending Act, 15 U.S.C. §§ 1601–1665, but it has not chosen to regulate interest rates to be charged in such transactions. Moreover, Congress has expressly deferred to State regulation of consumer credit interest rates. 15 U.S.C. § 1610(b) reads:

"(b) This subchapter does not otherwise annul, alter or affect in any manner the meaning, scope or applicability of the laws of any State, including, but not limited to, laws relating to the types,

amounts or rates of charges, or any element or elements of charges, permissible under such laws in connection with the extension or use of credit, nor does this subchapter extend the applicability of those laws to any class of persons or transactions to which they would not otherwise apply."

See also *Aldens, Inc. v. Packel, supra.* Thus, there is no pre-emption in this area.

■■■ With regard to the second of the above-stated criteria, whether this is an area which requires a uniform national policy, the Court need not consider whether this is a situation which requires a uniform national policy. Congress has the undoubted power to redefine the distribution of power over interstate commerce. It may either permit the States to regulate commerce in a manner which otherwise would not be permissible, or exclude State regulation of matters of local concern which nevertheless affect interstate commerce. *Southern Pacific Co. v. Arizona, supra.* Congress in enacting the Federal Truth In Lending Act, has deferred to State regulation of consumer credit rates. Thus, even if this was an area requiring a uniform national policy, Congress has redefined the power over interstate commerce in this area and allowed States to regulate consumer interest rates. The Court would not be entitled to substitute its judgment for that of Congress. See also *Aldens, Inc. v. Packel, supra.*

The third Commerce Clause criteria which must be considered is whether the alleged State Statute regulates in an evenhanded manner to effectuate a legitimate local concern. The evenhandedness of the Oklahoma UCCC is unquestionable. It imposes exactly the same burdens on in-State sellers as upon out-of-State sellers. It cannot be seriously contended that the Oklahoma UCCC discriminates against interstate commerce. That the regulation of consumer interest rates is a legitimate local concern is also undoubted. Congress, in the exercise of its paramount authority under the Commerce Clause, has left the regulation of consumer credit rates to the State.

Thus, in Congress' judgment, consumer credit rates are matters of local concern and it would be overreaching for this Court to reject that judgment.

The final Commerce Clause element which must be considered herein is whether the burden imposed on interstate commerce by compliance with the maximum interest rates provided by the Oklahoma UCCC clearly outweigh the local benefits which can be supposed to be derived therefrom. This standard is clearly the heart of the Commerce Clause and the gist of this case. It is only through the application of this standard that such diverse cases as *South Carolina State H. Dept. v. Barnwell Bros., supra,* and *Bibb v. Navajo Freight Lines,* 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959) can be reconciled. In *South Carolina State H. Dept. v. Barnwell Bros., supra,* the Court upheld a South Carolina Statute which restricted the size and weight of trucks which would be permitted to use South Carolina's highways. These size and weight restrictions were clearly out of step with the size and weight restrictions imposed by other states, and the enforcement of these restrictions would have the effect of impeding the free flow of interstate commerce through the State of South Carolina. However, the Supreme Court upheld the right of South Carolina to impose these regulations. In *Bibb v. Navajo Freight Lines, supra,* the Court overturned, as an impermissible burden on interstate commerce, an Illinois Statute which required a certain type of mud flap on trucks using Illinois highways. The type of mud flap required by Illinois was not the type of mud flap in general usage at that time. An Arkansas regulation required the use of a different type of mud flap. Thus, in order to travel through both Arkansas and Illinois, a truck would have to stop and change mud flaps. *Bibb* and *Barnwell* can only be reconciled through an examination of the relative benefits to be derived locally through the application of the challenged regulation. In *Bibb,* the Court found that the type of mud flap required by Illinois had no direct relation to safety. However, in *Barnwell Bros.,* the Court found that the size and weight restrictions imposed by South Carolina had a definite and immediate relation to safe usage of South Carolina highways. Thus, a State regulation may burden to some extent interstate commerce if that regulation has a sufficiently great putative local benefit.

The determination of whether the putative local benefit clearly outweighs the burden on interstate commerce is clearly a balancing test. In *Bibb* the Court stated:

"A State which insists on a design out of line with the requirements of almost all other States may sometimes place a great burden of delay and inconvenience on those interstate motor carriers entering or crossing its territory. Such a new safety device—out of line with the requirements of the other States—may be so compelling that the innovating State need not be the one to give way. But the present showing—balanced against the clear burden on interstate commerce—is far too inconclusive to make this mudguard meet that test."

In this case, the burden imposed on interstate commerce by the application of Oklahoma's UCCC to Aldens is clear. The parties have stipulated that it would cost Aldens $160,500.00 per year to comply with the Oklahoma UCCC. The putative local benefit is far less clear. For the past six years, Aldens' annual sales to Oklahoma residents have averaged $2,252,000.00. Aldens has approximately 13,800 Oklahoma credit customers. Their average credit balance is $176.00. During the last six years, Aldens has assessed approximately $455,000.00 per year in finance charges on the accounts of its Oklahoma customers. Aldens' monthly finance charge on accounts less than $350.00 is 1.75%. Oklahoma law permits a 1.50% charge. Thus, assuming that all of Aldens' accounts were less than $350.00, and assuming further that a strict percentage reduction would accurately reflect the difference in amounts collected, if Aldens complied with the Oklahoma maximum of 1.50% on its charge accounts, Aldens' Oklahoma credit customers would

save only $69,000.00 per year. Thus, the cost to Aldens would greatly outweigh the savings to Oklahoma residents.

However, notwithstanding that under the facts of this case the cost to Aldens to comply with the Oklahoma Code would far outweigh the savings resulting therefrom to its Oklahoma customers, the burden imposed on interstate commerce by Oklahoma's imposition of maximum interest rates does not so outweigh the putative local benefits as to constitute an impermissible burden on interstate commerce. Clearly the states have a great interest in preventing their residents from being victimized by what they consider to be excessive interest rates. See *Aldens, Inc. v. Packel, supra.* It is the task of the State Legislature to determine what constitutes excessive interest. The Court cannot determine on a case-by-case basis whether the application of State interest laws constitute an impermissible burden on interstate commerce. Thus, if Oklahoma cannot impose its maximum interest rates on Aldens in this situation because Aldens is charging only slightly above what it considers to be an acceptable interest rate, then Oklahoma could not impose its maximum interest rates in a situation where its resident was being charged an interest rate which was so in excess of the permitted interest rate that the cost of compliance would be far less than the savings to the Oklahoma resident. A State's interest in protecting its citizens from what it considers to be excessive interest rates is far too great to allow such a result.

Moreover, Congressional deference to State interest regulation as expressed by 15 U.S.C. § 1610(b) must again be considered. Congress has paramount authority to regulate commerce between the States. It has deferred to State regulation of interest rates. Even though such regulations might otherwise constitute an impermissible multiple burden on interstate commerce, Congress has the power to allow such a burden. It has done so here. Thus, the burden on interstate commerce occasioned by the application of the Oklahoma UCCC to Aldens under the facts of this case does not outweigh the putative local benefits of the Oklahoma UCCC. Therefore, the Court concludes that the application of the Oklahoma UCCC in this case to Aldens does not violate the Commerce Clause.

## ILLINOIS CONTRACT

Aldens' final Constitutional argument is that the Due Process Clause and Commerce Clause prohibit Oklahoma's refusal to honor and enforce in its Courts valid Illinois contracts as is attempted by 14A Oklahoma Statutes, § 1–201(5)(a). Aldens' due process argument in this respect is not well taken and the very cases cited by Aldens tell the Court to rule against it. It is true that a State may not, on the grounds of policy, ignore a right which has lawfully vested elsewhere if the interest of the forum has but slight connection with the substantive contractual obligation. However, a State may prohibit enjoyment in its borders of rights acquired elsewhere which violate its laws or public policy and, under some circumstances may refuse to aid in the enforcement of such rights. *Hartford A. & I. Co. v. Delta & Pine Land Co., supra; Home Ins. Co. v. Dick,* 281 U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926 (1930). In this case, Oklahoma has prohibited the enjoyment within its borders of rights technically acquired in Illinois under Illinois law. In view of the degree of Oklahoma's contacts with the subject transactions, Oklahoma may validly take this action without running afoul of the Due Process Clause of the Fourteenth Amendment.

With regard to Aldens' contention that the Commerce Clause prohibits Oklahoma's refusal to enforce its contracts with Oklahoma residents, all relevant factors have previously been considered. This is a case in which a State has a strong local interest in the amount of finance charges to be paid by its citizens in consumer credit sales. It is to be distinguished from *Allenberg Cotton Co., Inc. v. Pittman,* 419 U.S. 20, 95 S.Ct. 260, 42 L.Ed.2d 195 (1974), which is relied on by Aldens. A State does not have a strong interest in denying a

foreign corporation the use of its forum. However, Oklahoma does, as has previously been developed, have a strong interest in preventing its citizens from paying excessive interest. Local interest is strong enough to overcome Aldens' Commerce Clause objections. Therefore, 14A Oklahoma Statutes, § 1–201(5)(a) does not run afoul of the Commerce Clause or the Due Process Clause of the Fourteenth Amendment.

## DE MINIMUS

Aldens' final contention is that Ryan is not entitled to recover on his Counterclaim (1) because the amount involved is de minimus, and (2) because the UCCC discriminates against interstate commerce in that it does not allow sufficient time for compliance. The doctrine of *de minimus non curat lex* is inapplicable herein because by Aldens' own admission the Counterclaims involve amounts in excess of $8,000.00. The fact that the cost to Aldens to compute and return these sums would exceed the amount of the individual refunds does not render the amounts involved de minimus. With regard to the second contention, it has already been determined that § 1–201A does not discriminate against interstate commerce.

Accordingly, Judgment should be entered denying Plaintiff's request for declaratory judgment and dismissing Plaintiff's action. Judgment should be entered on Defendant's Counterclaim for damages and injunctive relief. If a hearing or other action is necessary before the amount of damages can be ascertained Defendant will initiate appropriate action without delay. Judgment will be withheld as to Plaintiff's action until Judgment is ready for entry on Defendant's Counterclaim.