**ALDENS, INC., an Illinois Corporation, Plaintiff,**

v.

**Thomas J. MILLER, as Attorney General of the State of Iowa, and as Administrator of the Iowa Consumer Credit Code, Senate File 1405, 65th General Assembly, 1974, Defendant.**

**No. 74–182–2.**

United States District Court, S. D. Iowa, Central Division.

March 5, 1979.

B. A. Webster and John G. Fletcher of Gamble, Riepe, Burt, Webster & Fletcher, Des Moines, Iowa, for plaintiff.

Julian B. Garrett and Kathryn Graf, Asst. Attys. Gen., State of Iowa, Des Moines, Iowa, for defendant.

## MEMORANDUM AND ORDER

HANSON, Senior District Judge.

Plaintiff Aldens, Inc. (herein Aldens) filed a complaint on July 12, 1974, seeking a declaratory judgment that certain provisions of the Iowa Consumer Credit Code (now Chapter 537 of the Code of Iowa) were unconstitutional as violative of the Commerce Clause of the Fourteenth Amendment. The defendant, the Attorney General of the State of Iowa, as Administrator of the Iowa Consumer Credit Code, filed a motion to dismiss on September 30, 1975, urging the Court to invoke the "ab-stention doctrine" in light of a state action filed September 29, 1975 by the defendant to enjoin the plaintiff from assessing, collecting, or receiving a finance charge in excess of that provided in Chapter 537. The Court denied the defendant's motion in an order dated November 4, 1975, as the issue before the Court involved the constitutionality of Chapter 537 and not its possible state court construction.

Because the amount in controversy exceeds the sum of $10,000 and the action involves the validity of a state statute under the Constitution, the Court finds it has jurisdiction pursuant to 28 U.S.C. § 1331(a).

The complaint seeks a declaration of the rights of parties pursuant to the authority granted under 28 U.S.C. § 2201 and Rule 57, F.R.Civ.P. Accordingly, the Court finds that the complaint may be brought as a declaratory judgment action in that an actual controversy exists between the parties.

This cause of action came on for trial before the Court on March 22, 1978. There were no significant facts in dispute as a stipulation was agreed to by the parties, and the Court now enters its findings and conclusions in accordance with Rule 52, F.R. Civ.P.

## FINDINGS OF FACT

Aldens is a general retail merchandise business located in Chicago, Illinois, and sells its goods solely by mail order to purchasers who reside in all fifty states, including, Iowa. Aldens does not have any office, distribution house, sales house, warehouse, or any other place of business in Iowa nor does the company advertise its merchandise for sale in Iowa newspapers, on billboards in Iowa, or by placing advertisements with Iowa radio or television stations. There is no telephone listing for the company in the state. No agent, salesman, canvasser, solicitor, or any other type of representative exists in Iowa to sell or take orders, to deliver or service the merchandise sold by Aldens. The company does not own any real or personal property in Iowa.

Aldens mails catalogs to certain Iowa residents approximately four times per year,

supplementing these with "flyers" approximately six to eight times per year. Included in the catalogs are application forms for credit accounts with Aldens, and, upon completion of the forms, Iowa residents mail them to the plaintiff's Chicago headquarters, the only office which can extend credit to purchasers. The credit agreement used by Aldens states that it is an Illinois contract governed by Illinois law, and provides for a monthly finance charge of 1.75 percent on the portion of the average daily balance of the customer's account on amounts of $350 or less for an annual rate of 21 percent, and a monthly finance charge of one percent on that portion of such balance in excess of $350 for an annual rate of 12 percent. These rates are in conformance with Regulation Z promulgated by the Federal Reserve Board under the Federal Truth-in-Lending Act, 12 C.F.R. § 226.7 (1978), and are also in compliance with Illinois law. Albeit, the rates are not similarly in compliance with Chapter 537,[1] which limits the finance charge on consumer credit sales to a maximum of 1.5 percent per month on the first $500 of a customer's account, for an annual rate of 18 percent.[2]

Merchandise sold to Iowa purchasers is delivered on an f. o. b. point of origin basis to those customers by deposit in the United States mail, delivery to a common carrier in Chicago, or by shipment from some point outside the State of Iowa. On credit sales Aldens pays the shipping, handling, and transportation costs, and then bills the customer for those charges.

Aldens retains only a purchase money security interest in any merchandise sold pursuant to the credit agreement with its purchasers. The purpose of this provision of the credit agreement is to conform to Aldens' accounting practices and to inform purchasers that the company has such a security interest to the extent of the unpaid balance of the merchandise. Aldens does not file any financing statements or other interest documents with the State of Iowa, nor does the company enforce any security interest in such merchandise. Aldens has a security interest in unpaid-for merchandise only to the extent provided by law. In the past, however, Aldens has employed Iowa collection agencies to collect bad debts in the event an Iowa customer failed to make at least a $5 payment on his account in the six-month period. The company has indicated that it may or may not continue this practice after the conclusion of this litigation.

Aldens is not required to collect or remit Iowa sales or use taxes, or to pay any other Iowa taxes.

In 1976, approximately 1.72 percent of Aldens sales were made to Iowa purchasers and approximately 1.42 percent of this amount was derived from credit sales. The number of Aldens active credit accounts in Iowa for 1976 totalled approximately 20,200 and the average credit account balance equalled approximately $178.22.

## CONCLUSIONS OF LAW

Similar issues and contentions of the parties before the Court have been examined

---

1. Section 537.1201 has to do with the territorial application of the Iowa Consumer Credit Code. The pertinent provisions of paragraph 2 of that section state:

    1. This chapter applies to: . . .
    c. Acts, practices or conduct in this state in the solicitation, inducement, negotiation, collection or enforcement of a transaction, without regard to where it is entered into or modified;

    .    .    .    .    .

    2. For the purposes of this section, a transaction is entered into or modified in this state if any of the following apply: . . .
    b. In an open end credit transaction:
    (1) If the buyer, lessee or debtor is a resident of this state either at the time the buyer,

lessee or debtor forwards or otherwise gives to the person extending credit a written or oral communication of his intention to establish the open end transaction, or at the time the person extending credit forwards or otherwise gives to the buyer, lessee or debtor a written or oral communication giving notice to the buyer, lessee or debtor of the right to enter into open end transactions with such person, unless the parties have agreed that the law of the residence of the buyer, lessee or debtor applies in which case that law shall apply.

2. Aldens has adopted a new credit agreement for its Iowa customers, pending the decision in the present case, which complies with the provisions of Chapter 537.

by the Third Circuit in *Aldens, Inc. v. Packel*, 524 F.2d 38 (3d Cir. 1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976); the Seventh Circuit in *Aldens, Inc. v. LaFollette*, 552 F.2d 745 (7th Cir. 1977), *cert. denied*, 434 U.S. 880, 98 S.Ct. 236, 54 L.Ed.2d 161 (1977), and the Tenth Circuit in *Aldens, Inc. v. Ryan*, 571 F.2d 1159 (10th Cir. 1978), *cert. denied*, —— U.S. ——, 99 S.Ct. 180, 58 L.Ed.2d 169 (1978). In each case the court resolved the issue adversely to the constitutional claims of Aldens. The Court arrives at the same conclusion as did those three courts and therefore dismisses the plaintiff's cause of action.

### A. Commerce Clause

The plaintiff sets forth a two-pronged attack against the provisions in Chapter 537: one, that the State of Iowa lacks the power to regulate Aldens' purely interstate sales; and, two, that Iowa's regulation of Aldens' interstate sales constitutes an undue burden on interstate commerce.

The *Packel* court articulated a number of categories under which state regulations could be subject to invalidation through the commerce clause [3] and then upheld the provisions of the Pennsylvania Goods and Services Installment Sales Act, 69 P.S. §§ 1101–2303 (Supp.1975) as they related to Aldens' transactions with Pennsylvania residents, as Aldens' situation did not fall within the purview of any category. Aldens maintains, however, that *Allenberg Cotton Co. v. Pittman*, 419 U.S. 20, 95 S.Ct. 260, 42 L.Ed.2d 195 (1974), *National Bellas Hess, Inc. v. Department of Revenue*, 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967) and *Eli Lilly & Co. v. Sav-On-Drugs, Inc.*, 366 U.S. 276, 81 S.Ct. 1316, 6 L.Ed.2d 288 (1961)

have carved out another commerce clause basis for invalidating state regulations. The underpinning of plaintiff's premise is that the commerce clause prohibits a state from regulating purely interstate sales to its residents, viz., when the foreign seller engages in no local activity in the regulating state. Since the transactions between the company and Iowa residents are said to have no intrastate aspects whatsoever, Aldens argues the operation of Chapter 537 "can only fall directly and impermissibly on interstate commerce itself." Brief for plaintiff at 5. In this regard the Court "need only make a threshold determination that the regulating state is without the power to impose its will on interstate business activity." Brief for plaintiff at 11. This "per se" approach to limitations on the exercise of state power under the commerce clause, however, is without merit, and has been invariably rejected. As the Tenth Circuit observed:

> Physical presence of Aldens in Oklahoma is not required to subject its credit rates to state regulation in transactions with Oklahoma residents . . . . The states can, of course, pass Acts which affect commerce unless the burden so imposed greatly exceeds the extent of local benefits. *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326; *Great Atlantic & Pacific Tea Co., Inc. v. Cottrel*, 424 U.S. 366, 96 S.Ct. 923, 47 L.Ed.2d 55; *Head v. New Mexico Board*, 374 U.S. 424, 83 S.Ct. 1759, 10 L.Ed.2d 983.

*Aldens, Inc. v. Ryan, supra* at 1161.

Aldens' reliance on *National Bellas Hess* as controlling the outcome of the present case is misplaced. It is now well-settled that *National Bellas Hess* is considered in

---

**3.** "We suggest, then, that the commerce clause limits the power of a state to impose its choice of law on any transaction that is within the broad ambit of congressional power to regulate *interstate commerce, and*

(1) is one in which Congress has made its own choice of law, or

(2) is one in which Congress has made no specific choice of law, but

(a) despite this inaction the nature of the subject matter requires a uniform rational rule, or

(b) the choice of law made by the state discriminates against persons engaged in interstate commerce in favor of local interests, or

(c) a non-discriminatory state choice of law, in an area where national uniformity may not be essential, imposes a burden on interstate commerce in excess of any value attaching to the state's interest in imposing its regulation." 524 F.2d at 45–46 (footnotes omitted).

the same vein as a tax case,[4] which summons different constitutional considerations for a court than a case which involves the constitutionality of a state's regulatory measures.[5] *National Geographic Society v. California Board of Equalization,* 430 U.S. 551, 97 S.Ct. 1386, 51 L.Ed.2d 631 (1977); *Aldens, Inc. v. LaFollette, supra* at 752–753; *Aldens, Inc. v. Packel, supra* at 49; *Confederated Tribes of Colville v. State of Washington,* 446 F.Supp. 1339 (E.D.Wash.1978). *National Bellas Hess* merely held that a state could not, consistent with Article I, § 8 of the Constitution and the Due Process Clause of the Fourteenth Amendment, impose the obligation on an out-of-state mail order insurance company to collect a use tax from its customers in the state. *Allenberg Cotton, supra,* and *Eli Lilly, supra,* are similarly inapposite to Aldens' position. The Third Circuit succinctly distinguished those cases by noting the enactment of the Federal Truth-in-Lending Act: [6]

> The most significant difference between cases involving state statutes closing the door to foreign corporations and this case is that here Congress has expressly deferred to the states on the matter of consumer credit interest rates. Congress having used the legislative scales, there is no need and there may be no room for the kind of judicial weighing which produced one result in *Eli Lilly* . . . and another in *Allenberg Cotton* . . Even if Congress had not done so, *Allenberg Cotton* is in any event distinguishable from this case because of the significant local impact of the time-price differential paid by Pennsylvania residents and the relatively slight burden on interstate commerce from Pennsylvania's regulation of that differential.

*Aldens, Inc. v. Packel, supra* at 50.

The issue is not one of blanket limitations on state power, but one of balancing the interests involved. This raises the question of whether or not the operation of Chapter 537 imposes an undue burden on interstate commerce. The resolution of this question hinges on a balancing of the federal interest in the unrestricted flow of commerce among the several states with the state's interest in the area of consumer credit transactions.

The purposes of the commerce clause, *inter alia,* include the notions that commercial enterprises in every state are entitled to substantial equality of access to a free national market,[7] and that commercial intercourse should be protected from invidious restraints imposed by the legislatures of the several states.[8] In the case *sub judice,*

---

4.  The Seventh Circuit noted:
    > Any doubt that *Bellas Hess* was being analyzed as a tax case, even though strictly speaking the duty imposed on Bellas Hess was to collect a tax falling on someone else, was conclusively dispelled by footnote 9 . . . . Thus as a *de facto* tax on a purely interstate trader, the legislation in *Bellas Hess* was a *per se* undue burden.

    *Aldens, Inc. v. LaFollette, supra* at 753.
    Footnote 9 of the *National Bellas Hess* opinion, in pertinent part, states:
    > Strictly speaking, there is no question of the connection or link between the State and "the person . . . it seeks to tax." For that person in *Miller Bros. Co. v. Maryland,* 347 U.S. 340, [74 S.Ct. 535, 98 L.Ed. 744] in *Scripto, Inc. v. Carson,* 362 U.S. 207, [80 S.Ct. 619, 4 L.Ed.2d 660] and in the present case is the user of the goods to whom the out-of-state retailer sells. National is not the person being directly taxed, but rather it is asked to collect the tax from the user. It is, however, made directly liable for the payment of the tax whether collected or not. 386 U.S. at 757 n.9, 87 S.Ct. at 1391.

5.  Generally speaking, tax statutes enacted by a state are accorded great judicial dubiety for the purpose of commerce clause analysis since "no extraterritorial manifestation of sovereignty, except possibly arrest, is quite so offensive to common notions of its territorial limits." *Aldens, Inc. v. Packel, supra* at 43.

6.  Act of May 29, 1968, Pub.L. No. 90–321, Title I, § 102 *et seq.,* 82 Stat. 146, 15 U.S.C. §§ 1601–65 (1976).

7.  *American Can Co. v. Oregon Liquor Control Com.,* 15 Or.App. 618, 517 P.2d 691 (1974).

8.  *Pennsylvania v. West Virginia,* 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923), *aff'd on rehearing,* 263 U.S. 350, 44 S.Ct. 123, 67 L.Ed. 1144 (1923); *Western Union Tel. Co. v. Pendleton,* 122 U.S. 347, 7 S.Ct. 1126, 30 L.Ed. 1187 (1887); *Robbins v. Shelby County Taxing Dist.,* 120 U.S. 489, 30 L.Ed. 694 (1889); *Welton v. Missouri,* 91 U.S. 275, 23 L.Ed. 347 (1875);

these purposes are not offended by the provisions delineated in Chapter 537. Adherence by foreign sellers to the maximum interest rate prescribed by the Iowa legislature does not restrict the flow of commerce between the states in any constitutional sense. A state may regulate intrastate activities occurring in connection with interstate commerce, and such legislation will not be subject to invalidation merely because of its incidental effect or indirect burden on interstate commerce. *Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960); *Milk Control Board v. Eisenberg Farm Products,* 306 U.S. 346, 59 S.Ct. 528, 83 L.Ed. 752 (1939); *South Carolina Hwy. Dept. v. Barnwell Bros.,* 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734 (1938). At the same time, however, if the effect on interstate commerce is unduly burdensome, the state regulation will be struck down. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970); *Bibb v. Navajo Freight Lines, Inc.,* 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959). Consequently, there is a significant distinction between "commerce among the states" and the internal affairs of the state: the federal government is not granted an exclusive dominion over all incidents encompassed within the phrase "interstate commerce" nor are the states endowed with the power to enact conflicting or hostile laws which impermissibly burden interstate business activity.

Aldens argues that the operation of Chapter 537 unduly burdens interstate commerce. This contention has been carefully considered and rejected in the three prior circuit cases, each of which involved Aldens as a litigant attacking statutory provisions substantially similar to Chapter 537. This Court finds the plaintiff's argument without substance and concurs with the reasoning of the Third, Seventh, and Tenth Circuits.

*Steamship Co. v. Portwardens,* 73 U.S. (6 Wall.) 31, 18 L.Ed. 749 (1867).

**9.** As the defendant points out in its brief, there are other different kinds of sellers—such as the

It is true that as a result of the operation of Chapter 537 Aldens and other foreign sellers similarly situated are encumbered to some extent. Aldens would be required to adjust its rates, advertising, credit agreements, and billing statements to conform to Iowa law, thereby increasing Aldens' cost of doing business. Aldens argues that the increased cost of complying with the regulations contained in Chapter 537 seriously discriminates against Aldens' interstate sales to Iowa residents and thus unduly burdens interstate commerce. But the mere cost of doing business with Iowa residents to interstate sellers does not amount to a substantial burden on interstate commerce. Contrary to Aldens' conclusion, Iowa is not discriminating against interstate commerce through the operation of Chapter 537—for it is manifest that interstate mail order companies have access to the Iowa market on the very terms as any other seller, whether or not the particular seller is physically located in the state.[9]

In contrast to the insubstantial burdens the operation of Chapter 537 imposes on interstate commerce, the interest of the State of Iowa in protecting its citizens from usurious interest rates in consumer credit transactions is considerable. And, it extends to credit sales solicited of and by Iowa residents in Iowa, notwithstanding that the contract terms declare the contract to be governed by the laws of the state in which the seller is located. It suffices to note that it is necessary for the states to enact reasonable consumer credit legislation to protect this public interest, for "in the power of the lender to relieve the wants of the borrower lies the germ of oppression." 45 Am.Jur.2d *Interest and Usury* § 4 (1969). Moreover, the federal Truth-in-Lending Act expressly recognizes the necessity of state regulations of interest rates in the field of consumer credit by providing:

This subchapter does not otherwise annul, alter or affect in any manner the

various gasoline companies—currently operating in interstate commerce, which are compelled to follow the diverse interest rate limitations set by the several states.

meaning, scope or applicability of the laws of any State, including, but not limited to, laws relating to the types, amounts or rates of charges, or any element or elements of charges, permissible under such laws in connection with the extension or use of credit, nor does this subchapter extend the applicability of those laws to any class of persons or transactions to which they would not otherwise apply.

15 U.S.C. § 1610(b) (1976).

Consequently, it appears that the additional costs imposed on Aldens' interstate transactions with Iowa residents as a result of the operation of Chapter 537 are not sufficient to outweigh Iowa's interest in protecting its residents from usurious interest rate charges. The only burden on Aldens is the incremental cost of complying with the regulations set forth in Chapter 537. This cost is non-discriminatory as applied to interstate sellers since it does not prevent access to or maintenance of sales within the boundaries of the state. Furthermore, this is a type of outlay which, in the operation of the law of supply and demand, may be passed on to the Iowa consumer.

Thus, for the reasons heretofore stated, the Court finds that the effect of Chapter 537 does not impose an undue burden on interstate commerce.

### B. Due Process Clause

"The due process clause of the fourteenth amendment limits the power of a state to export its sovereign decisional authority, including its authority to make choices of law, to transactions with which it has an insufficient minimum interest." *Aldens, Inc. v. Packel, supra* at 42. At the same time, the due process clause was not designed to curtail the power of a state to enact reasonable regulations governing transactions which enjoy some "nexus" with the state. *Cf. Friedman v. Rogers,* —— U.S. ——, 99 S. Ct. 887, 59 L.Ed.2d 100 (1979).

The essence of Aldens' argument parallels its commerce clause contention that the State of Iowa simply lacks the power to regulate the business transactions of a foreign corporation when there is no physical "nexus" or contact with the regulating state. Aldens concludes the provisions of Chapter 537 offend due process principles since

> Iowa . . . seeks to regulate these clearly interstate transactions by redefining essential elements of contract law. Sec. 537.1201 (Code of Iowa 1977) simply equates mail solicitation of a customer in Iowa with the making of a consumer credit transaction, and states that it is entered into in Iowa regardless of the agreement of the parties. . . . The legislative intent is clear—it proposes to convert what is indisputably an Illinois contract into an Iowa contract, so that Iowa may extraterritorially regulate the out-of-state activities of an out-of-state contract.

Brief for plaintiff at 17.

This position, however, ignores the state interest Iowa seeks to protect through the enactment of the Iowa Consumer Credit Code. And, to this extent, any legitimate state interest is sufficient to warrant an enactment of the state legislature.[10] Accordingly, the question becomes: is there any interest the State of Iowa has in restricting the maximum amount of interest in consumer credit transactions arising out of a systematic solicitation of Iowa residents by a foreign state seller?

The Court finds that the state does have an interest concerning the contractual relations of its residents with foreign mail order businesses. The state has a legitimate concern to shield its residents from usurious interest charges affixed to their consumer credit transactions with interstate sellers of merchandise; and, this is an interest which the state can safeguard by means of the legislative process notwithstanding the fact that the specific state action may have an

---

10. "Since *McGee v. International Life Insurance Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), it has been clear that the due process clause defines a rather low threshold of state interest sufficient to justify exercise of the state's sovereign decisional authority with respect to a given transaction." *Aldens, Inc. v. Packel, supra* at 43.

effect on the interstate sales of the foreign seller. *Travelers Health Assn. v. Virginia,* 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1949); *Hoopeston Canning Co. v. Cullen,* 318 U.S. 313, 63 S.Ct. 602, 87 L.Ed. 777 (1943); *United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir. 1945); *Osborn v. Ozlin,* 310 U.S. 53, 60 S.Ct. 758, 84 L.Ed. 1074 (1940). Aldens' imposition of a usurious interest charge violates the express public policy of the state that no Iowan shall pay more than that prescribed by Chapter 537 on his consumer credit transaction solicited in Iowa.[11] This concern of the state to prohibit usurious loans to its residents is sufficient to surmount the burdens placed on interstate sellers to conform to the provisions of Chapter 537. Notwithstanding this interest, Aldens' imposition of a usurious interest charge is iniquitous to the extent that any Iowa mail order house selling similar goods is disadvantaged. Allowing Aldens to charge an interest rate greater than that which any Iowa enterprise is able to impose gives Aldens an economic advantage over the instate competitor since Aldens may recoup comparatively greater profits on its sales to Iowa residents.

Again, Aldens contends that *National Bellas Hess* controls the outcome of the present case in this regard. An extended discussion in this memorandum is not required for the Third, Seventh, and Tenth Circuit cases herein cited amply canvass the merits of Aldens' argument. It suffices at this point to reiterate that *National Bellas Hess* held only that a state could not impose an obligation on an out-of-state mail order insurance company to collect a use tax from its customers in the state; and, because *National Bellas Hess* is considered a tax case, it triggers a "special due process scrutiny" not properly applicable here.[12]

Since Iowa has a demonstrably valid state interest in regulating the cost of credit available to its residents, the application of the provisions in Chapter 537 do not offend the due process clause.[13]

## ORDER FOR JUDGMENT

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that judgment

---

11. The purposes and underlying policies of Chapter 537 are contained in § 537.1102(2):

    a. Simplify, clarify and modernize the law governing retail installment sales, and other consumer credit.

    b. Provide rate ceilings for certain creditors in order to assure an adequate supply of credit to consumers.

    c. Further consumer understanding of the terms of credit transactions and foster competition among suppliers of consumer credit so that consumers may obtain credit at reasonable cost.

    d. Protect consumers against unfair practices by some suppliers, solicitors, or collectors of consumer credit, having due regard for the interests of legitimate and scrupulous creditors.

    e. Permit and encourage the development of fair and economically sound consumer credit practices.

    f. Conform the regulations of disclosure in consumer credit transactions to the Truth in Lending Act.

    g. Make the law, including administrative rules, more uniform among the various jurisdictions.

12. *See, Aldens v. Packel, supra* at 43.

13. Assuming *arguendo* that the reasoning of *National Bellas Hess* in fact controls the disposition of this case, it nevertheless appears that Aldens' credit transactions with Iowans are subject to the provisions of Chapter 537. The holding of *National Bellas Hess* was predicated on the happenstance that the plaintiff foreign mail order house had no connection whatsoever with the taxing state because, as a prerequisite to the imposition of the tax, due process demands that there be some nexus or "link" between the enterprise and the state which is not arbitrary or indefinite in character. *National Geographic Society, supra; Miller Bros. Co. v. Maryland,* 347 U.S. 340, 74 S.Ct. 535, 98 L.Ed. 744 (1954); *Wisconsin v. J. C. Penney,* 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267 (1940). To this extent, the "link" is sufficient if the seller receives any services from the taxing state. *Confederated Tribes of Colville v. State of Washington,* 446 F.Supp. 1339 (E.D.Wash. 1978). In contrast with the mail order house in *National Bellas Hess,* Aldens has previously employed Iowa agencies to collect on various bad debt accounts of Iowa residents and the Iowa courts were available to Aldens in seeking to enforce its contracts. Certainly this utilization of collection agencies might well suffice as a significant and substantial "link" between the state and Aldens for the purposes of due process in the taxing context.

be entered for the defendant, Thomas J. Miller, as Attorney General of the State of Iowa, and as Administrator of the Iowa Consumer Credit Code, Senate File 1405, 65th General Assembly, 1974, and that this cause of action be dismissed accordingly.