**MUCHMORE EQUIPMENT, INC., an Iowa Corporation, Appellee,**

v.

**Jim GROVER, Appellant,**

**Robert Muchmore and Diana Muchmore, Appellees.**

**No. 66162.**

Supreme Court of Iowa.

Jan. 20, 1982.

As Corrected March 12, 1982.

A. F. Craig, Jr. of Craig, Wilson & Flickinger, Independence, and George E. Wright of Napier, Wright & Wolf, Fort Madison, for appellant.

Franklin W. Sauer of Hoeger, McClintock & Sauer, Independence, for appellees.

Considered by REYNOLDSON, C. J., and UHLENHOPP, HARRIS, McGIVERIN, and SCHULTZ, JJ.

UHLENHOPP, Justice.

This appeal presents four issues in an action on a construction contract by a builder against an owner. The pleadings involve considerable procedural entanglement of parties, but in the disposition we make of the case we need only consider Robert Muchmore individually as the builder asking recovery and Jim Grover individually as the landowner for whom the building was constructed.

At the time of construction Grover had been a farmer for over thirty years and a substantial farmer in Buchanan County for twenty-three years. In 1978 he and his sons operated about 1500 acres of land. They had a large corn crop that year.

In the fall of 1978 Grover decided to place his corn in the federal reserve program. He contacted two firms which sell and build grain storage bins, but they were unable to construct the bin in time for the 1978 crop. Grover therefore contacted Muchmore, a nearby farmer who also built and constructed grain storage facilities.

Grover and Muchmore negotiated about construction of the bin that fall so that Grover could store his standing crop in it. Muchmore ascertained from suppliers that he could have the material on hand in three weeks, and he told Grover that he could obtain the labor to pour the concrete for the foundation and floor; Grover was to provide the fill. Muchmore's personnel were to construct the building itself. Muchmore gave the impression that construction would be completed within six weeks, but he did not expressly so promise.

On September 25, 1978, the parties entered into a written agreement in which Grover agreed to pay $39,755.12 for the constructed building. The written contract did not contain a completion date, did not cover the fill, and left the concrete work open. It also contained this term on the reverse side:

In event of default under the terms of this agreement, the purchaser owner agrees to pay service charges at the rate of 1% per month, plus legal fees.

The contract which Muchmore filed with the local Agricultural Stabilization and Conservation Service, through which Grover obtained a loan for the building, was somewhat different, and this apparently got Muchmore into some difficulty. We are satisfied, however, that the actual agreement was as we have stated.

The material arrived on time, and Grover obtained the fill. The laborers who were to pour the concrete proved to be unsatisfactory, however, and this part of the process dragged on and consumed valuable time when Grover and his sons should have been combining and storing the crop. Eventually Grover put additional personnel on this part of the work. Those individuals asked $8 an hour but finally accepted $7.50 an hour from Grover, in Muchmore's presence. Muchmore eventually completed construction of the building, and in the process utilized the labor of two of Grover's sons—one for 114 hours and the other for 7 hours. Construction was not completed, however, until about five or six weeks later than originally anticipated. Considerable snow then lay on the ground, and corn lodging and droppage occurred. One field of eighty acres could not be combined until spring. As a result, Grover lost a substantial amount of corn.

Grover paid $5755.12 when the contract was signed plus $25,000 when the material was delivered. The balance was to be paid on completion of the building. Some "extras" were installed, however, and Muchmore did not get around to final settlement until March 15, 1979. That day he came to Grover's farm home, and the two men went over the bills and arrived at a final settlement of $16,862.04. Two items remained outstanding. Part of the structure moved somewhat in the wind, and Muchmore promised to install a "truss kit." The men agreed at the time that Grover should withhold $500 to secure performance of that promise, reducing the present amount to be paid to $16,362.04. (Subsequently the truss kit became unnecessary, restoring the balance due to $16,862.04.) The other item involved the work of Grover's sons. Muchmore did not dispute that he owed them,

since he was to construct the building. He also apparently did not materially dispute their hours; the two men went over the records of their work. But Grover thought his sons should have $7.50 per hour, the same as the laborers he had paid, while Muchmore thought this was too much. Grover wanted Muchmore to pay the sons directly; he did not want to take their pay out of his check to Muchmore and then pay them himself.

The two men differed markedly at trial as to how this difference was resolved. Apparently it was resolved in some fashion because Grover drew and delivered his check to Muchmore for $16,362.04, and Muchmore endorsed a check payable to him and Grover for Grover's loan from A.S.C.S. Grover testified that Muchmore said he would come back that day with a check for the sons. Muchmore testified he only agreed he would "try." Just what he meant by that is not clear. He did not return or otherwise settle with the sons.

The men were questioned about this point several times at trial. The following excerpts are illustrative. Grover testified:

Q. Did you have a discussion at that time with regard to settlement of this matter? A. Yes, we discussed different items.

Q. Did you then—why don't you tell me what happened about your writing a check. He gave you a bill or what happened? A. He brought his bills. There was some additions that we did on the building and he had all his bills with him and we sat down and went over them, and along with it, I had the check from A.S.C.S. I got out he needed to countersign and I mentioned the boys' time, pointed the calendar out where they kept track of their time.

Q. All of this was to arrive at a figure to settle it? A. Yes.

Q. What did you mention to him about the boys' time? A. Well, I said, well, you know, the boys had hours in out there, helped erect the building, so we could get done. He said yes.

Q. Did you tell him how many hours there were then? A. We got the calendar down and I totaled them up. We agreed on the total hours there and he remarked, well, make your check out to me for the total and I'll make the checks for the boys.

Q. He told you not to take it out of the check, give it to him? A. He said make the total check to him and he would make out a check for the boys.

Q. Did you make the check to him? A. Yes.

Q. Did he make a check out for the boys? A. No.

Q. Did you ask him to make a check for the boys before he left? A. Yes.

Q. Why didn't he? A. He said he didn't have his checkbook and he wasn't the bookkeeper.

Q. Did he at that time say when he would give the check? A. He said he would be back that afternoon to give me the boys' check.

Q. Did he come back that afternoon? A. No.

Q. Did he ever come back? A. No.

Muchmore testified:

Q. What hourly rate, if any, did he want you to pay them at that time? A. $7.50 an hour.

Q. Was this after giving you the check withholding the five hundred dollars? A. Yes, it was.

Q. What did you tell him in response to that conversation? A. That's more than our help is paid.

Q. Did you tell him how much you paid your help? A. No I didn't.

Q. Did he ask you how much you paid your help? A. No.

Q. What happened next? Did you say anything further to him? A. He wanted me to get the checkbook and pay him. I said I don't carry the checkbook with me. He was quite persistent, but I don't carry the checkbook. I never do.

Q. Did you tell him you would return and pay those boys? A. He wanted me to return right away and pay them. I said I will try. We had a sow having

pigs. My wife called out she was having trouble with the sows having pigs and I tried at least to go home, and he said here sign this A.S.C.S. check and I signed it and left.

Also:

Q. Talking about the day, March 15th, the day you got the sixteen thousand dollar check, you told him you were going home to get your checkbook and as you say return with a check for the boys. Why didn't you get back that day? A. Had sows having pigs.

Q. How long did that last? A. Three or four days, a week. I don't remember for sure.

Q. Wasn't there anybody you could have sent over to Jim Grover's with a check? A. Everybody had their chores to do.

Q. You don't use the mails? A. At times.

Q. Could you have put the check in the mail? A. Could have. There was no agreement on the amount though, sir.

Q. You could have put the check in the mail, what you thought they were worth? A. That was not agreed upon.

Q. You really, when you left on March 15th, you intended to pay the boys something for their wages? A. Yes.

Q. And how much? A. They were starting help. Starting help started at $3.00 an hour.

Q. That's what you intended to pay them? A. Yes.

Q. For the number of hours that they worked? A. Yes.

Q. You still think you owe them that much? A. They want to pay their bill. I'll pay mine.

Muchmore's deposition testimony was read to him at trial and he expressed no disagreement with it. That testimony included this:

Q. But you did tell him that you didn't have your checkbook? A. I never carried a checkbook.

Q. Did you tell him that? A. Yes.

Q. Did you tell him that you would go home and get your checkbook and bring him a check back today? A. I would try to.

Q. And what amount were you going to put on the check? A. I don't know.

Q. Are you saying that you had not at that time agreed to bring him a check for the amount that he claimed you owed the boys? A. I didn't agree to pay them that much.

Q. You just said you were going to go home and get your checkbook? A. Correct.

Q. Did you ever come back that day? A. No.

Muchmore also testified at trial:

Q. So you did tell him you were going to come back with a check that day? A. I didn't say I was going to come back with a check that day. I said I would try to. That's what you just read too.

Q. Did you ever come back? A. No.

When Muchmore did not return to pay Grover's sons, Grover tried unsuccessfully to contact Muchmore by telephone and then stopped payment on the check of $16,362.04, intending thereby to require Muchmore to settle with the sons. Muchmore also tried unsuccessfully to contact Grover by telephone. At a later time Grover paid his sons at the rate of $7.50 per hour and took assignments from them of their claims against Muchmore.

Muchmore eventually commenced this action against Grover on the contract asking for the balance of $16,862.04, plus interest at 1% per month, attorney fees, costs, and $50,000 as punitive damages for Grover's stopping payment on the check. Division I of the petition was on the contract itself and prayed for "judgment in the sum of $16,862.04 plus interest at the rate of 1% per month from March 15, 1979, until paid, plus attorney fees and costs of this action." Division II incorporated division I, alleged that Grover fraudulently stopped payment on the check and is liable on the check for $16,362.04 plus $500 withheld for the truss kit, and prayed for "judgment in the amount of $16,362.04 plus interest at the

rate of 1% per month for the wrongful dishonor of the check drawn by Plaintiff and for the costs of this action." Division III incorporated divisions I and II, alleged malice, wantonness, and recklessness, and prayed for $50,000 exemplary damages.

Grover answered and also counterclaimed for damages on various grounds, principally for late completion of construction causing loss of corn and for his sons' assigned labor claims.

The trial court tried the case by ordinary proceedings. The court held for Muchmore in the amount of $16,292.04 on the contract ($16,862.04 less $570 for the sons' labor), found that the contract did not specify a completion date and denied the portion of the counterclaim for loss of corn, allowed the counterclaim for the sons' labor in the sum of $570, granted Muchmore interest on the difference of $16,292.04 at 1% per month from March 15, 1979, awarded Muchmore punitive damages of $10,000, and required Grover to pay Muchmore's attorney fees. The portions of the judgment material to Muchmore's claim state (as corrected by nunc pro tunc entries):

Defendant, Jim Grover, purchased, from Robert Muchmore, a grain storage building, including costs of cement and other materials in the amount of $47,-617.16. Defendant, Jim Grover, paid $30,755.12 on this account, leaving an unpaid balance of $16,862.04.

Jim Grover is liable to Robert Muchmore (Assignee of Muchmore Equipment, Inc.) in the amount of $16,862.04 [the amount prayed in division I] plus a charge of delinquency of 1% per month from March 15, 1979. Included in said sum is liability upon an unpaid check Jim Grover drew in the amount of $16,362.04, which he wrongfully stopped payment upon intending that it would not be paid until Robert Muchmore paid his two sons an hourly rate of $7.50 per hour.

. . . .

That the Plaintiffs are entitled to punitive damages in the amount of $10,000.00.

. . . .

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED:

Plaintiff, Robert Muchmore, shall have a judgment against the defendant, Jim Grover in the amount of $16,292.04 [$16,-862.04 less $570 which the court allowed for the labor of Grover's sons] plus a delinquency charge at the rate of 1% per month from March 15, 1979, until paid; punitive damages in the amount of $10,-000.00, and that the plaintiff is awarded his attorney fees the amount of which shall be determined at a later date before a Judge of this First Judicial District.

Grover appealed. In his appeal he raises these issues: the court erred in (1) granting 1% per month interest; (2) allowing Muchmore attorney fees; (3) awarding punitive damages; and (4) denying the damages asked in the counterclaim over the amount of $570 on the wage claim.

I. *Interest.* Although the contract denominates the item of 1% per month as a "service charge," the item amounts to interest. *State ex rel. Turner v. Younker Brothers, Inc.*, 210 N.W.2d 550, 560 (Iowa 1973). Grover urged at trial and urges here that chapter 535 of the Code applies to this transaction, that 1% per month exceeds the permissible rate under that chapter, and that under the provisions of the chapter interest is therefore not recoverable.

A. The contract was entered into on September 25, 1978. At that time the Code provided in section 535.2(3)(a):

The maximum lawful rate of interest which may be provided for in any written agreement for the payment of interest entered into during any calendar quarter commencing on or after July 1, 1978, shall be two percentage points above the monthly average ten-year constant maturity interest rate of United States government notes and bonds as published by the board of governors of the federal reserve system for the calendar month second preceding the first month of the calendar quarter during which the maximum rate based thereon will be effective, rounded to the nearest one-fourth of one percent per year.

On or before the twentieth day of March, June, September and December of each year the superintendent of banking shall determine the maximum lawful rate of interest for the following calendar quarter as prescribed herein, and shall cause such rate to be published, as a notice in the Iowa administrative bulletin or as a legal notice in a newspaper of general circulation published in Polk county, prior to the first day of the following calendar month. Such maximum lawful rate of interest shall be effective on the first day of the calendar month following publication. As soon as practicable after August 3, 1978, the superintendent of banking shall determine and publish the maximum lawful rate pursuant to this paragraph for the third quarter of 1978, which maximum rate shall be effective upon publication thereof. The determination of the maximum lawful rate of interest by the superintendent of banking shall be exempt from the provisions of chapter 17A.

At the time this contract was made the maximum rate under section 535.2(3)(a) was 10.25% per annum. III Iowa Admin. Bull. 17 (July 9, 1980).

The interest charge in the contract exceeded the rate allowed by chapter 535.

B. Muchmore claims, however, that the transaction comes under the Consumer Credit Code, chapter 537 of the Code, and specifically under section 537.2601(2):

> With respect to a credit transaction which would be a consumer credit transaction if a finance charge were made, a charge for delinquency may not exceed amounts allowed for finance charges for consumer credit sales pursuant to open end credit.

We may assume for purposes of decision that 1% per month would not "exceed amounts allowed for finance charges for consumer credit sales pursuant to open end credit." We may likewise assume, for the purpose of determining whether this "would be a consumer credit transaction if a finance charge were made," that a finance charge was in fact made. The question is, with a finance charge so assumed to have been made, was this a "consumer credit transaction"?

For the purpose of chapter 537, section 537.1301(12) defines a consumer credit transaction thus:

> "*Consumer credit transaction*" means a consumer credit sale or consumer loan, or a refinancing or consolidation thereof, or a consumer lease.

A "consumer credit sale" is defined in section 537.1301(13), but this transaction does not meet requirements (a)(1) or (a)(5) of that definition. A "consumer loan" is defined in section 537.1301(15), but this transaction fails to meet requirements (a)(1) and probably (a)(5). A "consumer lease" is defined in section 537.1301(14), but this transaction does not fulfill requirements (a), (d), and probably (e). If a finance charge were made here, this contract would not be a consumer credit transaction, for it does not come within the definition of such a transaction. Moreover, this contract itself was not on "credit"; it called for the balance in full upon completion of the building. *See State ex rel. Miller v. National Farmers Organization*, 278 N.W.2d 905 (Iowa 1979).

■ Muchmore charges generally that such a result is unconstitutional, that if others can have the benefit of interest rates permitted by the Consumer Credit Code he too should have that right. He cites us to pages 148 and 149 of the transcript, where he argued in the trial court that chapter 535 "discriminates unreasonably" against him. Essentially he is asserting unconstitutional classification.

The Consumer Credit Code is rife with classifications, and indeed that code is itself a classification. A consumer credit transaction is only one of the many classifications in the code. Consumer credit classifications regarding interest have generally been upheld against constitutional attack. *See Aldens Inc. v. Miller*, 466 F.Supp. 379 (S.D. Iowa), *aff'd*, 610 F.2d 538 (8th Cir. 1979), *cert. denied*, 446 U.S. 919, 100 S.Ct. 1853, 64 L.Ed.2d 273 (1980); *Committee Against Un-*

*fair Interest Limitation v. State*, 95 Cal. App.3d 801, 157 Cal.Rptr. 543 (1979); *see also* 45 Am.Jur.2d *Interest and Usury* § 6 (1969); 47 C.J.S. *Interest* § 5 (1946). We do not find merit in Muchmore's argument of unconstitutionality.

C. What are the effects of this usurious clause in the contract? Section 535.5 of the Code provides:

> If it shall be ascertained in any action brought on any contract that a rate of interest has been contracted for, directly or indirectly, in money or in property, greater than is authorized by this chapter, the same shall work a forfeiture of eight cents on the hundred by the year upon the amount of the principal remaining unpaid upon such contract at the time judgment is rendered thereon, and the court shall enter final judgment in favor of the plaintiff and against the defendant for the principal sum so remaining unpaid without costs, and also against the defendant and in favor of the state, for the use of the school fund of the county in which the action is brought, for the amount of the forfeiture; and in no case where unlawful interest is contracted for shall the plaintiff have judgment for more than the principal sum, whether the unlawful interest be incorporated with the principal or not.

■ Under this section, Muchmore can recover only the principal of the contract remaining unpaid. *Burrows v. Cook*, 17 Iowa 436 (1864). This principal, after deducting the offset allowed by the trial court for the labor of Grover's sons, is $16,292.04. Moreover, Muchmore is not entitled to court costs; the statute expressly so provides. Grover is thus liable to Muchmore for $16,-262.04 principal and also, under the statute, to the State for interest on $16,262.04 at 8% per annum from March 15, 1979, until judgment, for the use of the Buchanan County school fund. *Sheldon v. Mickel* 40 Iowa 19 (1874).

■ II. *Attorney fees.* Muchmore claims he is entitled to attorney fees on two bases under section 625.22 of the Code of 1981:

> When judgment is recovered upon a written contract containing an agreement to pay an attorney's fee, the court shall allow and tax as a part of the costs a reasonable attorney's fee to be determined by the court.
>
> In an action against the maker to recover payment on a check, draft, or written instrument written in violation of chapter 714, the plaintiff, if successful, may recover all court costs incurred, including a reasonable attorney's fee, or an individual's cost of processing a small claims recovery such as lost time and transportation costs from the maker of the check, draft, or written instrument.

Muchmore asserts that the contract contains an agreement to pay attorney's fees ("plus legal fees") so that the first paragraph of section 625.22 applies, and that Grover gave his check in violation of chapter 714 of the Code so that the second paragraph also applies.

One of Muchmore's problems is that under the first paragraph attorney fees are allowed and taxed "as part of the *costs*," and that under the second paragraph the plaintiff may recover "all court *costs* incurred, *including* a reasonable attorney's fee...." (Emphasis added.) But section 535.5 expressly provides in usury cases that the plaintiff obtains judgment for the principal sum "without costs." This court has held that this means the plaintiff is not only *disentitled* to the costs; he is *liable* for them. *Garth v. Cooper*, 12 Iowa 364 (1861). The court also stated in *City of Ottumwa v. Taylor*, 251 Iowa 618, 621, 102 N.W.2d 376, 378 (1960), "Substantially all authorities agree attorney fees are not taxable as costs unless specifically authorized by statute." *See also Virginia Manor, Inc. v. City of Sioux City*, 261 N.W.2d 510, 513 (Iowa 1978); *Rauch v. Senecal*, 253 Iowa 487, 491, 112 N.W.2d 886, 888 (1962) ("The general rule is that attorney fees are not recoverable by a successful litigant against his adversary.").

In addition, section 535.5 expressly provides that "in no case" shall the plaintiff have judgment "for more than the principal sum...."

We hold that by virtue of the usury statute, Muchmore cannot recover attorney fees. Whether he would be entitled to them but for the usury statute we need not inquire.

■ III. *Exemplary damages.* The action is for breach of contract. We stated in *Pogge v. Fullerton Lumber Co.*, 277 N.W.2d 916, 919–20 (Iowa 1979):

Narrowing our focus to Iowa, this jurisdiction early ruled punitive damages were not recoverable for breach of contract. *Lacey v. Straughan*, 11 Iowa 258 (1860). Although by implication or by dicta we have indicated exceptions may exist in breach of warranty or contract cases, *Jacobson v. Benson Motors, Inc.*, 216 N.W.2d 396, 405 (Iowa 1974), *Engel v. Vernon*, 215 N.W.2d 506, 516–17 (Iowa 1974), our most definitive statement is found in *Kuiken v. Garrett*, 243 Iowa 785, 800, 51 N.W.2d 149, 158 (1952), where, quoting 15 *Am.Jur. Damages* § 273 (1938), the court noted:

"This rule [no punitive damages for breach of contract] does not obtain, however, in those exceptional cases where the breach amounts to an independent, wilful tort, in which event exemplary damages may be recovered under proper allegations of malice, wantonness, or oppression.... In some states they are recoverable for breach of contract where there has been some intentional wrong, insult, abuse, harshness, or such gross neglect of duty as to evince reckless indifference of the rights of others or where, and only where, the breach is accompanied with a fraudulent act."

In *Meyer v. Nottger*, 241 N.W.2d 911 (Iowa 1976), we recognized the viability of a prayer for punitive damages in a count claiming damages for mental distress arising out of an alleged breach of contract for burial services for plaintiff's father. The same facts supported a tort claim in another count. The *Meyer* court, following *Amos v. Prom, Inc.*, 115 F.Supp. 127, 136–37 (N.D. Iowa 1953), and *Syester v. Banta*, 257 Iowa 613, 628–

29, 133 N.W.2d 666, 676 (1965), in exploring the dimensions of conduct invoking an award for punitive damages, held such an award was permissible where defendant was guilty of malice, fraud, gross negligence, or an illegal act. It is not an essential element of malice that defendant's actual spite or wicked intent be demonstrated: An issue may be made by evidence of legal malice, which may be established by showing wrongful or illegal conduct committed or continued with a willful or reckless disregard of another's rights. *See White v. Citizens National Bank*, 262 N.W.2d 812, 817 (Iowa 1978); *Northrup v. Miles Homes, Inc.*, 204 N.W.2d 850, 859 (Iowa 1973).

From the above cases there emerge these guiding principles:

(1) Punitive damages cannot be recovered for breach of contract;

(2) Punitive damages may be recovered when the breach also constitutes an intentional tort, or other illegal or wrongful act, if committed maliciously;

(3) It is sufficient if the malice is only legal malice, that is, committed or continued with a willful or reckless disregard of another's rights;

(4) The intentional tort or other illegal or wrongful act may occur at the time of and in connection with the breach; but

(5) A wrongful act in this context is not committed merely by breaching a contract, even if such act is intentional.

*See also Pringle Tax Service, Inc. v. Knoblauch*, 282 N.W.2d 151 (Iowa 1979).

Under these principles, the evidence here does not support an award of exemplary damages on either side. In settling their affairs under the contract, a controversy arose between the two men over the amount of the wages of Grover's sons. The case is a typical contract dispute; practically every such action involves a dispute of some kind, otherwise a lawsuit would not be brought. Were we to permit punitive damages here, such damages would be recoverable in contract actions as a matter of course, contrary to the general rule. We hold that Muchmore is not entitled to exem-

plary damages. *See Holcomb v. Hoffschneider,* 297 N.W.2d 210 (Iowa 1980).

 IV. *Counterclaim.* Grover asserts that the trial court erred in holding against him on his counterclaim (which he also asserted as a third-party claim) except to the extent of $570 for his sons' wages. Without question Grover sustained substantial damages from lodged and down corn as a result of the late completion of the building. Also without question, Grover generated a fact issue on his claim that the hourly rate for his sons should be $7.50, rather than a lesser rate allowed by the court.

The case was tried, however, by ordinary proceedings, and the trial court's fact findings, if supported by substantial evidence, have the force of a special verdict. Iowa R.App.P. 14(*f*)(1). We view the evidence in the light most favorable to the judgment. *Nora Springs Co-op Co. v. Brandau,* 247 N.W.2d 744 (Iowa 1976).

The trial court could have found for Grover on his claim for lost corn and for a wage rate of $7.50 per hour, but was not bound to do so. Grover had the burden of proof on these items, and seldom does a party having the burden sustain it as a matter of law. *Johnson v. Svoboda,* 260 N.W.2d 530, 536 (Iowa 1977). The court could find from the evidence that the contract had no fixed completion date and, indeed, that Muchmore refused to promise a date when the project would be finished. The court could also find that the reasonable wage rate for the sons was as low as $3 per hour. The court's findings on the counterclaim must stand.

We thus return the case to district court with directions to vacate the present judgment and to enter judgments (1) for Muchmore and against Grover for $16,292.04, and (2) for the State of Iowa for the use of the Buchanan County school fund and against Grover for a sum equal to 8% per annum times $16,292.04 from March 15, 1979, until the date of the judgment. Interest on the judgments will run at the legal rate for judgments from their respective dates until paid. We further direct the district court to assess the costs in that court against

Muchmore. Costs in this court are likewise assessed against him.

MODIFIED, AFFIRMED, AND REMANDED WITH DIRECTIONS.